## Simpson, et al. v. Simpson, et al.

(Decided October 20, 1911.)

## Appeal from Washington Circuit Court.

1. Instructions.—An instruction to the jury should not be given upon a question upon which there is no evidence to which the instruction could be applied.

2. Wills—Insane Aversion—Instruction.—Where a testator was a strong headed, passionate and willful man, and equally unreasonable and exacting with all of his children, an instruction based upon an alleged insane aversion to one of his children, who was a contestant of the will, was properly refused by the trial judge.

3. Wills—Offer to Compromise.—Where two of ten children offered a brother $1,500.00 of the estate in addition to the share given him by the will, provided he would not join in the contest, but would help to sustain the will, and the brother to whom the proposition was made declined to accept it, and testified as a contestant of the will, the trial judge properly refused to admit the offer of compromise in evidence.

4. Instructions.—Where an offered instruction has been substantially given by the court in another instruction, it is not error to refuse to give the duplicate instruction.

NAT W. HALSTEAD and JOHN W. LEWIS for appellants.

JOHN S. KELLY, W. C. M'CHORD, T. SCOTT MAYES and W. F. GRIGSBY for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This is an appeal by Robert L. Simpson, Annie Carney, Blanche Spalding and Arthur Simpson from a verdict and judgment establishing the will of their father, John A. Simpson, who was an unusually active and energetic farmer and stock raiser and trader, of Washington County. He was twice married, his first wife having died

more than 20 years ago; and his second wife having died in about 1897. By his first wife Simpson was the father of the three appellants, Robert L. Simpson, Mrs. Annie Carney and Mrs. Blanche Spalding. By his second marriage he had seven children; Hall Simpson, Arthur Simpson, Reuben Simpson, Edna Simpson Ball, Alma Simpson Smith, Henry Simpson and Willaim Simpson. Of the children by the second marriage all are appellees and contestees of the will with the exception of Arthur Simpson, who was a contestant, and is one of the appellants here. Shortly after the death of their mother, Arthur and Hall Simpson, who were then about 16 and 14 years of age, respectively, left their father's home and went to work for others for wages. They continued at service, working for other people on their own account, and collecting and retaining their wages. There is considerable conflict in the testimony as to the reason why these boys left their father's home. Arthur says it was because of the mistreatment of them by their father; while Hall says it was because of a disagreement with their sister, Mrs. Carney, who kept house for her father. When Arthur and Hall left home their father had left with him only one son, Reuben, then 11 or 12 years of age, who was able to help him on the farm. In September, 1901, John A. Simpson concluded to make a division of a large part of his estate, by way of advancement to his older children, who were then married and living to themselves. He then had an estate worth from about twenty-three to twenty-five thousand dollars. He called together his three older children, who are appellants here, and told them of his intention to give each of them $2,000. In the execution of this purpose he gave Robert the "Felix Nall Farm," valued at $6,000, $2,000 of which should constitute the gift, and the other $4,000 to be a charge or debt against the farm. He gave another farm of the value of $4,000 to Mrs. Spalding, $2,000 of which should be a gift, and $2,000 a charge against the land. And to Mrs. Carney he gave $2,000 represented by his note which was subsequently paid. The shares were selected by lot, and, as originally drawn, Mrs. Carney drew the "Felix Nall Farm;" but, being unable or unwilling to pay for so costly a place, she exchanged portions with her brother Robert. Their father carried out this arrangement and made deeds to his children for their respective properties as above indicated. They accepted the property and have

ever since retained it. Considering the value of his estate at that time; the fact that he had at least five small children to raise and educate, and disregarding the probable contingency of business reverses, the advancements can not be said to be a grossly unequal division of the testator's estate, if at all unequal. The advancements were received by the donees seven and a half years before the younger children were to get anything, which would make each advancement worth, at ordinary interest, nearly $3,000 at the time of Simpson's death. At the same time—September 24th, 1901, he made his will which is in contest here, the material part of which reads as follows:

"Item 1. I will and direct that all my just debts and funeral expenses be first paid.

"Item 2. I have this day made a deed of gift in land to the extent of two thousand dollars to my son, Robert L. Simpson, which I now declare shall be in full of his interest in my estate, and I will and direct that he shall no further interest or share therein at my death.

"Item 3. I have this day made a deed of gift in land to the extent of two thousand dollars to my daughter, Blanch Spalding, and which I now declare shall be in full of her interest in my estate, and I will and direct that she shall have no further interest or share therein at my death; that said deed is made to my said daughter in fee simple.

"Item 4. I have this day executed and delivered to my daughter, Annie E. Carney, my note for two thousand dollars, payable on or before twelve months from this date, without interest; and should I die before having paid off said note, then it is my will and desire that same be paid her out of my estate, but should said note be paid before my death or afterwards it shall be in full of all interest my said daughter, Annie, is to have or take in my estate, and I bequeath and devise her nothing than said two thousand dollars when paid.

"Item 5. I will and bequeath the sum of one thousand dollars to each of my two children, Arthur Simpson and Hall Simpson, in full of their respective interest or share in my estate.

"Item 6. I devise and bequeath all the residue of my estate and property, real, personal and mixed to my five children, Edna, Reuben, Alma, William and Henry Simpson, share and share alike to each of them."

John A. Simpson died on March 12th, 1909, about seven years and six months after he had made his will, and under 70 years of age. The grounds of contest are, that the testator was not of sound mind or disposing memory; that he had an insane aversion to his son, Arthur, and that the execution of the will was procured by the exercise of undue influence. The record contains a large mass of conflicting testimony upon these issues. It is unnecessary, and it would be impossible to satisfactorily review this testimony in the course of an opinion of ordinary length; it will be sufficient to give a brief outline of the testimony upon which instructions were given and refused. The trial judge gave five instructions. The first directed a verdict for the contestants, if the jury should believe that Simpson was not of sound mind and disposing memory at the time he executed his will; while the second instruction was the converse of the first, and presented the other side of that issue. The third instruction defined the phrase ''sound mind and disposing memory,'' and to which no serious objection is taken. The fourth instruction reads as follows:

''Although you may believe from the evidence that said Simpson at the time of the execution of the paper marked 'A' had mind and memory sufficient to know his property, and the value thereof, and to take a rational survey of the same, and to dispose of it according to a fixed purpose of his own, yet, if you shall further believe from the evidence that, at said time, said Simpson did not also have mind and memory sufficient to know his children, the natural objects of his bounty, and his duty to them, you should find against said paper marked 'A' and your verdict should read as set out in instruction No. 1.''

The fifth and last instruction was the usual instruction as to the power of the jury to return a majority verdict.

Appellants insist, however, that the court committed at least three substantial errors against them; (1), in refusing to give an instruction upon the subject of undue influence in the execution of the will; (2), in refusing to give an instruction covering the alleged insane aversion of John A. Simpson to his son, Arthur; and, (3), in refusing to permit an alleged contract of July 10th, 1909, between Reuben Simpson and Edna Ball upon the one part, and Arthur Simpson upon the other part, to be

read in evidence. We will briefly consider and dispose of these objections in the order given.

1. Clearly, the circuit judge properly declined to give the proffered instruction upon the subject of undue influence, since there is no testimony tending to establish that charge. It is elementary law that an instruction should not be given upon a question upon which there is no evidence to which the instruction could be applied. Wilkins v. Usher, 123 Ky., 702; Hollingsworth v. Barrett, 31 Ky. Law Rep., 428; Maysville, etc., R. R. Co. v. Willis, 31 Ib., 1251.

2. The appellants asked, and the court refused to give instruction "T," which reads as follows:

"The court instructs the jury that if they believe from the evidence that John A. Simpson, at the time of the execution of said paper marked 'A,' if he did execute it, had an insane aversion to his son, Arthur Simpson, and that such aversion entered into the making of said paper 'A' offered as the will of said John A. Simpson, and that under the influence thereof the testator made a different disposition of his property than he would have made but for such insane aversion, then they should find the paper 'A' not to be the will of said John A. Simpson."

This instruction was asked upon the strength of certain testimony which tends to show that John A. Simpson had continually mistreated Arthur Simpson after he left his father's home shortly after his mother's death. It will be noticed that the will puts Arthur and his brother, Hall, upon precisely the same footing as devisees, and that both boys left their father at about the same time. If there was any discrimination against Arthur, there was a like and equal discrimination against Hall; and there is no claim that the father had an insane aversion to his son, Hall. The testimony shows that John A. Simpson was a money maker far beyond the average farmer, and looked upon the labor of his sons as an asset in his business. These boys left their father as soon as they were able to perform any substantial work upon the farm, and six or eight years before they reached their majority. It is argued, and it is doubtless true, that the father felt, that in depriving him of this period of profitable labor they had mistreated him, and that he had only charged them in his will with what he had lost by their untimely desertion. With the possible exception of Reu-

ben, the other boys were then too young to be of any substantial aid upon the farm. Furthermore, although it appears that the father was quite severe in his treatment of Arthur, who was the eldest of the two boys, it is also apparent that he was severe and exacting with all of his children. If it be said that he was unreasonable with Arthur, he was likewise unreasonable with Hall and the others. In short, he was a strong-headed, passionate, willful man; and the evidence shows that Arthur inherited no inconsiderable part of these paternal qualities. As has been appropriately said, "he was a chip off the old block."

Furthermore, in 1907, some eight years after the boys had left home, they requested their father to buy for them the "Felix Nall Farm," which he had given to their brother, Robert, at the time he made his will; and the father granted their request by buying the farm back from Robert for $9,000, and turning it over to his sons, Arthur and Hall. He stocked it for them, and set them up as independent farmers; but Arthur soon fell out with Hall and his wife, and left the place. This farm had been charged to Robert at $6,000, but had so increased in value in the meantime that his father paid $9,000 for it when he bought it for Arthur and Hall. Furthermore, subsequently to this, John A. Simpson loaned Arthur money which he never repaid. Many eccentricities and pecularities upon the part of John A. Simpson have been pointed out as evidence of his unsoundness of mind, and of his aversion to his children. These matters, however, were all submitted to the jury under proper instructions, and it is not our province to weigh the evidence. No instruction was asked or given as to any aversion upon the part of the father to his son, Hall; and under all the testimony we are of opinion it was not proper to give an instruction upon that question as to Arthur.

3. When this contest was first threatened, Reuben Simpson and Edna Simpson, two of the residuary legatees under the will, sought to prevent a contest of their father's will by offering Arthur Simpson $1,500 of the estate, in addition to his distributable interest as devisee under the will, provided he would not engage in, encourage or countenance any contest, and would render every service in his power to maintain and establish the will of his father. This proposition was reduced to writing and signed by Reuben and Edna Simpson, but was not

signed or accepted by Arthur Simpson. When the contest was first instituted Arthur was made a contestee, but upon his own motion he was subsequently made and is now a contestant, and appellant here. The appellants offered to prove the fact of the proposition, and to read the paper in evidence, but were not permitted to do either, and it is insisted that this is a reversible error. Arthur Simpson appeared as a contestant and testified in his own behalf. If the proposition had been accepted by him, and he had remained a contestee, and then testified in behalf of the appellants, his evidence would have been against his own interest, and the paper might then have been admissible; but, as the case stands, it was a mere unaccepted proposition upon the part of Reuben and Edna Simpson to prevent a contest over their father's will, which was not successful. Compromises of litigation have always been favored by the courts, and to such a degree that failures of such attempts are not permitted to be given in evidence. Furthermore, it would have shed no light upon the issue of will or no will, which was the only issue before the jury. We think the court properly refused to admit the paper in evidence.

Appellants offered instruction "Y" to the effect that the jury should find against the will if, at the time he executed it, Simpson did not have such sensibilities as to enable him to know the duty he owed to his children, who were the natural objects of his bounty. This point, however, was substantially covered by instruction No. 4 above referred to, and it was not error to refuse it in the form asked by the contestants.

Taking all the evidence into consideration, we are of opinion that the case was fairly presented to the jury, and that the judgment should be affirmed. It is so ordered.


Dissenting opinion by Judge Nunn. .

I dissent for the only reason that the lower court refused to allow the proffered contract between Reuben and Edna Simpson and Arthur Simpson to be read as evidence to the jury. The jury had the right to consider these facts, not that it threw any light on the state of mind of John A. Simpson, but they had the right to consider it as evincing an intent on the part of the contestees and the length they would go in obtaining evidence to sustain the will.