## Kentucky & Indiana Terminal R. Co. et al. v. Cantrell.

Dec. 5, 1944.

744

Edward P. Humphrey and Louis Seelbach for appellants.

Harry N. Lukins for appellee.

OPINION OF THE COURT BY JUDGE HARRIS—Affirming.

The appellants state the case:

"This is a suit for damages for personal injury and damages to an automobile, arising out of a collision occurring between an automobile, owned by the appellee, which was being driven by him in a southerly direction on Olive Street, and a passenger train of the Southern Railway Company going east toward the intersection in the Western part of the City of Louisville, Kentucky, on September 26, 1942 at about 8:05 P. M. * * * The jury found a verdict in favor of the plaintiff for $5,600 against both defendants. The motion for a new trial, with supporting grounds, which was filed in the lower Court by the defendants was overruled, and from the judgment entered on the verdict of the jury the defendants have prosecuted an appeal to this Court. * * * Olive Street runs north and south and the tracks, which belong to the Kentucky & Indiana Terminal Railroad Co., on which the Southern Railway train was being operated, run east and west. There were two main tracks

at that point, and north of them a side track. The passenger train was running on the south main track in an eastwardly direction and the K. & I. freight train was running west on the north main tracks. The railroad tracks curve in a northwestwardly direction to some extent from the western side of Olive Street, though they are practically straight for a distance of about 230 feet west of Olive Street. At the northwest corner of the intersection of the tracks and Olive Street there were some small wooden buildings, which caused an obstruction of view. The Kentucky & Indiana Terminal Railroad Co. had installed and maintained red flasher lights on both sides of the tracks on Olive Street. * * * The lights operated automatically and at the same time when a train going in either direction, east or west, came on the circuit, and they kept flashing on and off until the train was off the circuit, or if there were two trains on the circuit at the same time, until both were off. When the lights were flashing on the south side, they were also flashing on the north side, and when the red lights were so flashing, the white telltale lights on the east and west side of each semaphore were also burning, which was notice to engine men approaching Olive Street that the red flasher lights were in operation as a warning to persons traveling south and north on Olive Street, approaching the tracks. The same light that showed through the red flasher lenses also showed white through the telltale lens. When a train was going west on the north main track, the red lights and white telltale lights at Olive Street would begin to operate when the train reached a point 1,110 feet east of Olive Street. When a train, such as the passenger train here, was going east toward Olive Street, the flasher lights and the telltale lights at Olive Street would start operating when the train reached a point 785 feet west of Olive Street. * * * The engineer could not see the automobile approaching from the north side of the tracks, because the boiler of his engine cut off his view northwardly. Moreover, until the moment of the accident the freight train was between the automobile and the passenger train, which obstructed the view of both the fireman and the engineer. The automobile approached the tracks on the fireman's or left side of the passenger locomotive. * * * The engineer of the passenger train testified that his train was approaching Olive Street at a speed of 12 to 15 miles an hour. * * * The engineer, upon

receiving the danger signal from the fireman, put on his emergency brakes immediately and ran the length of the engine, tender, and two baggage cars and a few feet more, or about 140 or 150 feet, beyond the crossing. * * * The engineer and fireman testified that they were on the lookout ahead, that the automatic bell on the engine was ringing as the train approached Olive Street, and the headlight of the engine was burning, which cast its rays for a considerable distance ahead of the train and could be seen easily by anyone approaching the crossing. The engineer of the passenger train saw the telltale light on the south side of the tracks on the west side of the semaphore burning when he was 230 feet west of the crossing and knew therefore that the red flasher lights were in operation at Olive Street as a warning to the public not to attempt to cross the tracks, as a train was coming. The engineer testified that the stop he made was a good one. He said that if the train had been going 40 miles an hour at that place, he could not have stopped short of 500, or more likely 600 feet, * * *.

"Aaron Q. Keith, introduced by the defendants, testified that he was a locomotive engineer of 27 years' experience and he rode along these tracks eastwardly toward Olive Street on this train later, sitting on the engineer's seatbox, and they could see the telltale light burning in the semaphore when at 230 feet west of Olive Street. He further said that if the train had been going 40 miles an hour, it could not have been stopped in less than 500 or 600 feet.

In addition to the evidence which was in substance and effect as indicated in the statement above, as well as in addition to evidence showing that the flasher lights were properly functioning both before and after the accident, and that reasonable inspection had been maintained, the fireman on the passenger train testified:

"Q. 41. Did you see the one on the northwest corner of the intersection? A. No, sir; because that—it sets back behind the coal-yard there, and you *can't* see it, approaching it from around the curve that way.

"Q. 42. That is for westbound trains, anyhow, is it not? A. Yes, sir.

"Q. 43. And the one on the southeast corner is for eastbound trains, is it not? Is that right? A. Well, there is no—

"Q. 44. For the engineer? A. Yes, sir.

"Q. 45. Now, did you or not see this semaphore on your side before the accident? A. No, sir.

"Q. 54. You could not see the light for the coal shed? A. That is right.

"Q. 58. Can you see one the way you approached there on account of the coal shed? Tell the jury that? A. I can see it when we go over Olive Street.

"Q. 59. As you go over the street, then you can see it, that is for the first time? A. Yes, sir."

On the other hand the appellee and his witness testified:

"Mrs. Ryan: The bell was not ringing and the train was traveling forty miles an hour.

"Mr. Ryan: On the occasion in question the train was traveling forty miles an hour. On other occasions he had observed that when the last car of a train was on the crossing the signal lights would quit flashing.

"Mr. Skarman: Q. 21. Did you see the lights stop? A. Yes, sir.

"Q. 22. State whether or not the lights were working as Mr. Cantrell started or as he drove on the track. A. They were not; because I was going myself—I was going to go across at the same time—and I wouldn't have gone if they were working.

"Q. 23. Do you mean you started across? A. I started, too, and I would have gone if he hadn't gone first.

"Q. 24. I want you to tell the jury whether or not you are positive about the lights. A. Yes, I am positive the lights weren't working, because I wouldn't have tried to go across if they had been.

"Q. 25. Were you looking at them? A, Yes, sir.

"Q. 26. How long had you been standing there? A. About three or four minutes.

"Q. 27. How long had Mr. Cantrell been standing there? A. About the same time.

"Q. 28. Where was his automobile—the automobile in which he was riding—in reference to the automobile in which you were riding? A. Just a little bit ahead of

748

me, about three-fourths of a car. I had pulled up a little bit alongside of him.

"Q. 29. You mean you had pulled up a little bit alongside of Mr. Cantrell? A. Yes, sir.

"Q. 30. After the freight train passed what, if anything, did you start to do? A. I started to gc across, too.

"Q. 62. Was there any bell ringing on the train? A. There was not.

"Q. 63. Mr. Skarman, did you take opportunity to observe the signals at the crossing within a few days? A. I noticed it many times since that, we have stopped and watched there when other trains crossed there, exactly the same set up, and it would stop like that—The following week we noticed it more than ever because it was so recent—the accident.

"Q. 65. Did you in the week following the accident observe those signals at that crossing? A. Yes, sir.

"Q. 66. State to the jury whether or not they worked then? A. They did not.

"Q. 67. Was the situation under which you observed them the week following the same as the situation was at the time this occurred? A. Very similar, there would hardly be any difference unless it would be passenger trains, both of them, or freight trains, both of them—I don't remember—but it was the same set up exactly."

The appellee:

"A. Well, when I left Miss Ruth Lucas out at the church, I was returning home, and when I had reached Woodland and Olive, I made a left turn, going south on Olive. I saw a freight train going by. I pulled up there and made my stop. I don't know how long I had been sitting there; and as that freight train had cleared the crossing, the flasher lights went out. I started up, and when I had reached the south track, I saw a headlight coming towards me. I did not have a chance to get out of the way of it. I cut the steering wheel of my car to the left, and from there, I don' know what happened.

"24. About how long were you stopped there before you went across? A. I could not say how long; about two or three minutes."

"31. That far, anyway. Now, tell the jury—I want you to tell the jury whether or not those flasher lights were working when you started to go across that track? A. They were not.

"32. I want you to tell the jury whether or not you looked before you started across that track? A. I did."

"47. Now, going on there, is there much or little curve in that railroad track as the train approaches you at the time it struck you? Is there a curve in that track? A. Yes, sir.

"48. Is there much curve? A. Well, it is a pretty big curve that goes around there.

"49. Tell the jury as you approach there, whether or not the lights from an approaching train, like the one that struck you, shine straight down the track? A. They were not on the track, because the outside curve comes all the way around the coalhouse, and there was no light on the track. The headlight on the engine, it made—it was not on the track. I did not see any. And when that train comes around there, the headlight of that engine, it throws it out over there in the bushes, in a field like, but there was no light on the track."

While the appellee was upon the witness stand he was confronted with the following written statement, which he admitted he signed at the instance of a representative of the appellants:

"When I turned South on Olive St., I saw a freight train going West on the railroad and flasher lights were flashing and I stopped my auto until the freight train cleared the crossing and as soon as rear car cleared crossing, I started across the tracks * * *"

"I do not feel that I am entirely responsible for this accident, as the view to the West was obstructed by the freight train and prevented me seeing the train coming from that direction, and kept me from hearing the approaching train and I think the railroad company should be willing to pay for my lost time and expenses. I do not have any insurance on my car.

"I have read this statement and it is true."

In the notion that the importance of the case and of the principles involved required it, we have gone to pains—even to the point of tediousness—in presenting

the circumstances of the accident. Having met that requirement, we shall now consider the complaints of the appellants and the argument of counsel with respect thereto, but not necessarily in the order in which they are presented in the briefs.

First. The appellants contend that no distinction can be drawn between this case and the case of Chesapeake & O. R. Co. v. Harrell's Adm'r, 258 Ky. 650, 81 S. W. 2d 10; Id., 271 Ky. 763, 113 S. W. 2d 23, and that on the authority of the latter the appellants' motion for a peremptory instruction should have been sustained. Counsel are in error. There is a decisive distinction between the two cases. In the cited case it was daylight, the crossing signal lights were working, the crossing signal bell, or gong, was sounding, a fellow motorist blew her automobile horn, and another person called to the decedent; it was under those circumstances that the decedent drove his automobile immediately behind a passing freight train into the path of the approaching passenger train. In the present case, according to the testimony of the appellee and of his witnesses—which for the purposes of the motion are to be considered as true—the bell on the engine was not ringing and the crossing signal light had ceased to flash. These circumstances constituted an invitation and a direction to the appellee to proceed; under them the court could not say that the appellee was guilty of contributory negligence as a matter of law. Louisville & N. R. Co. v. Cooper, 296 Ky. 307, 176 S. W. 2d 693, 694.

Second. The appellants contend that the Court should have given the jury Instruction No. 2, as offered by them: "It was the duty of the plaintiff to wait on the North side of the tracks until the freight train going West had cleared the crossing at Olive Street and until the freight train had gone such distance beyond or West of Olive Street as would enable the plaintiff in the exercise of ordinary care to discover the approach of the passenger train and keep out of its way and avoid a collision therewith, and if the jury believe from the evidence that the plaintiff failed so to do, the law is for the defendants and the jury shall so find, even though the jury may believe from the evidence that the defendants or either of them were negligent in any respect."

That instruction, in effect, is a "stop, look, and listen" instruction; and, as said in the Cooper case

supra: ''We think that the correct rule to be gathered from these authorities, and the many others cited therein, is that where the injuries were received at a public crossing, for which the required signals were not given, and nothing is shown against the injured person indicating lack of care on his part, other than that he failed to 'Stop, Look, and Listen,' he cannot be said to have been guilty of contributory negligence as a matter of law. Of course, if he is aware of the train's approach and attempts to cross in front of it, the rule stated has no application. Chesapeake & Ohio R. Co. v. Hobson's Adm'r, supra (244 Ky. 162, 50 S. W. 2d 560); Chesapeake & Ohio R Co. v. Bryant's Adm'r, 272 Ky. 339, 114 S. W. 2d 89.''

True in principle, as suggested by appellants, a general instruction on contributory negligence is not sufficient when a concrete one is asked for under facts that justify it, as in the cited cases of Cumberland R. Co. v. Girdner, 174 Ky. 761, 192 S. W. 873; Louisville & N. R. Co. v. Jackson's Adm'r, 243 Ky. 59, 47 S. W. 2d 941. Those cases, however, are not in point and not available here. By its very nature such an instruction points out and emphasizes certain portions of the evidence which the jury has heard. This should not be done except in those rare instances in which facts peculiar to the case authorize it. This is not one of those instances.

Nor do we agree with appellant, either on authority of the cited cases of American Dist. Tel Co. v. Oldham, 148 Ky. 320, 146 S. W. 764, Ann. Cas. 1913 E, 376; Sprague v. Bertke, 214 Ky. 441, 283 S. W. 401; Johnson v. Langley, 247 Ky. 387, 57 S. W. 2d 21; Dix v. Gross, 271 Ky. 231, 111 S. W. 2d 673, or otherwise that appellee's written statement convicted him of contributory negligence or entitled appellants to a peremptory instruction. The cited cases merely hold that declarations against interest are competent as substantive evidence, and not merely for the purposes of contradiction or impeachment. The appellee's statement was not contradictory of his testimony upon the trial; and while it was permissible for the appellants to introduce it, yet at most it was entitled only to such significance as the jury saw fit to ascribe to it. The appellants complain of that portion of the instruction which permitted the jury to decide that the flasher lights and telltale lights

were not operating on the south side of the south track at the time of the accident. In support of this complaint they call attention to the fact that the testimony of the appellee and his witnesses related solely to the flasher light north of the north track; whereas, they contend all of the evidence with reference to the light on the south side was to the effect that it was flashing. Under the circumstances, therefore, it is contended that the rule in Simpson v. Simpson, 145 Ky. 45, 139 S. W. 1100, 1102, is applicable and controlling, to-wit: "It is elementary law that an instruction should not be given upon a question upon which there is no evidence to which the instruction could be applied." The weakness of appellants' position is that according to their own evidence and according to the position taken in another part of their brief, the light on the south side of the tracks can not be working unless the light on the north side of the tracks is working. Since the appellee and his witnesses testified that the light north of the crossing was not flashing, it was proper for the court to submit the question to the jury.

Third. Appellants' objection to the first instruction is directed at paragraph (c) thereof, which deals with speed. In support of their objection they argue that if the engineer were required to observe the duty imposed by this instruction at every crossing in the City of Louisville and in the country districts, the movement of traffic would be unduly restricted and delayed. In this connection, however, they cite no authority to sustain their position, and virtually concede that they have none.

The point should be made at once that we are not dealing with crossings generally, but with the crossing mentioned and described in the record, which appellants' own evidence and brief show to be an unusual and exceedingly dangerous one. It is the type of crossing which imposes upon the railway company a greater degree of care than it owes at the usual ordinary crossing. In paragraph (a) of this instruction the court told the jury that it was the duty of the engineer to keep a lookout ahead for persons and vehicles. This was correct and proper; it is a duty which is owed at every crossing, and the erection and maintenance of gates or lights does not relieve the railway company of that duty.

It would not make sense to require a lookout at

such a dangerous crossing and at the same time sanction a rate of speed which would render the lookout futile. Under the conditions which prevailed in this case, the jury could well have concluded that any speed which was so great that the train could not be stopped within the 230 feet mentioned in the evidence was an excessive speed and negligent. The instruction as given was proper.

The flasher lights were installed and maintained by the appellant Kentucky & Indiana Terminal Company, and were under its exclusive control. With proper inspection and repair, barring some situation beyond the Company's control, the lights would function properly and serve the purpose for which they were designed. When the appellee showed that they were not working at the time of his accident, and that they did not work on other occasions, the burden shifted to the Company to show that it had exercised ordinary care. Whether the Company sustained this burden was a matter to be determined by the jury.

Judgment affirmed.