NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, a Voluntary Unincorporated Association, By and Through BELLARMINE COLLEGE, One of the Members Thereof, Movant,

v.

Paul HORNUNG, Respondent.

No. 87–SC–580–DG.

Supreme Court of Kentucky.

June 9, 1988.

Edward H. Stopher, Raymond G. Smith, Louisville, for movant.

William C. Boone, Jr., Schuyler J. Olt, Mark S. Riddle, Louisville, for respondent.

LAMBERT, Justice.

Upon a jury verdict, judgment for consequential and punitive damages of $1,160,-000 was entered for respondent, Paul Hornung, upon his claim against movant, the National Collegiate Athletic Association (NCAA), for intentional interference with a prospective contractual relation. The judgment of the trial court was affirmed in all respects by the Court of Appeals. This Court granted discretionary review and upon examination of the evidence, concludes that the trial court erred in failing to sustain the NCAA's motion for directed verdict.

Upon his retirement from professional football, Hornung began a career as a sports broadcaster. From the mid–1960's until 1980, he held a number of positions in which he worked as a play-by-play announcer and color analyst of college and

professional football games. During this period, Hornung participated, without objection from the NCAA, in broadcasting college football games.

In 1980 and 1981, Hornung hosted a series of weekly television broadcasts called "Football Saturday Live," a talk show about college football, for WTBS in Atlanta. During that time, in 1981, WTBS learned that the NCAA was soliciting bids for a "supplementary series" of college football games to be broadcast on a cable network. During negotiations with WTBS which followed, the NCAA insisted on having a right to approve the announcers for the series. An agreement was reached and WTBS obtained the right to telecast nineteen games in each of the 1982 and 1983 seasons for a sum of money in excess of $17 million. As a part of the agreement, the NCAA was granted the right to approve or disapprove any announcer or color analyst used on the broadcasts. The minutes of the meeting in which the agreement was reached state:

> Any announcers selected by Turner [WTBS] for participation on the NCAA supplementary football television series must be approved by the NCAA Football Television Committee.

The agreement between WTBS and the NCAA was documented in the "1982 Football Television Committee Report," as follows:

> The Committee shall have the right of consideration and prior approval of all personnel proposed for on-air work by the carrying companies.

Hornung does not dispute the right of approval granted the NCAA under its contract with WTBS.

While negotiations were underway between the NCAA and WTBS, Hornung was informed by Robert Wussler, president of WTBS, that an agreement appeared to have been reached for the supplementary series and that Hornung's name would be submitted for approval. Hornung offered no objection to the submission of his name. He was also informed that the supplementary series of live games would replace "Football Saturday Live" and that on the new series, he would be the color analyst.

On March 29, 1982, the NCAA Television Committee met in New Orleans to make plans for the upcoming season including broadcast plans for the supplementary series. The Committee was comprised of nineteen men and women who were associated with member universities and conferences. All members were present at the meeting. Also present were WTBS president Robert Wussler and Terry Hanson, executive producer of sports at WTBS. During the meeting, WTBS submitted the names of four persons whom it proposed as announcers for the supplementary series. Hornung was one of the persons named. The Committee briefly discussed the proposed announcers and then voted unanimously to disapprove Hornung, and one other person who had been proposed, as announcers for the supplementary series.

After the Committee vote and during a recess of the meeting, two members of the Committee approached Hanson and Wussler in the hallway and suggested that WTBS use Eddie Crowder, a member of the Committee, as one of its announcers. Nothing came of this suggestion, however, and Crowder was not proposed or considered for the position. There was no evidence that Crowder's name was mentioned prior to the Committee's negative vote on Hornung. Later, Tim Foley and Alan Page were approved by the NCAA and employed by WTBS as announcers for the supplementary series.

About three weeks after the meeting, Wiles Hallock, Chairman of the NCAA Television Committee, was contacted by a reporter from an Atlanta newspaper. In response to a question from the reporter, Hallock stated that "[T]he Committee objected to Hornung because 'ever since Paul graduated from Notre Dame he had been associated with professional football and perhaps does not represent college football.'" This statement was widely published.

After Hornung's rejection by the Committee, Mr. Hanson of WTBS requested a letter from the NCAA to confirm its disap-

proval of Hornung. His stated reason for wanting such a letter was "we have a relationship with Paul Hornung ... that I want to protect and we have to have that in writing before I'll deem it official." In response to this request, on April 22, 1982, the NCAA wrote WTBS as follows:

Paul Hornung: Paul Hornung was not approved for 1982. The Committee believes he is closely identified with professional football, that he had at least one undesirable public situation while a professional player that the image which he projects or is projected for him does not personify college football.

WTBS furnished a copy of this letter to Hornung who contacted Billy Reed of the *Courier–Journal* and read portions of the letter to him. Based in part on the letter, Reed wrote a newsstory about Hornung's rejection and the story was published in the *Courier–Journal* on May 11, 1982.

At trial, Committee Chairman Hallock testified that the reasons for Hornung's disapproval were:

My own experience with the Committee, and you find this in the Constitution and By–Laws of the NCAA, was first of all to protect the objective of keeping a strong demarcation between amateur—college football and professional football. There are strong resolutions and actions within the NCAA By–Laws, statements against gambling. I felt very definitely that the combination of the identification, the primary identification since—pretty much since Paul Hornung graduated in 1956 was with professional football. I felt personally that the unfortunate suspension of Mr. Hornung for gambling activity was not something that the NCAA wanted to simply overlook in the selection of people to represent college football on television. I had a personal feeling that the national image as continually being represented by Miller Beer of Paul Hornung's life-style was not in keeping with any positive—certainly any positive quality that the NCAA was interested in condoning in any way. Those were my personal feelings.

The NCAA makes a number of attacks upon the orders and rulings of the trial court and the opinion of the Court of Appeals. Principally, however, it contends that Hornung failed to prove that it "improperly" interfered with his prospective contractual relation with WTBS. Admitting that its actions were intentional, the NCAA argues that before recovery may be allowed, proof of malice is required. According to the NCAA, there was no proof of malice; its disapproval of Hornung being a legitimate exercise of its contract right with WTBS. Hornung argues to the contrary that a showing of malice is not required for recovery. He argues that it is sufficient to prove that the NCAA's interference with his prospective contract was intentional and without reasonable justification. The trial court and the Court of Appeals held that the NCAA had a right to approve or disapprove Hornung, but was required to exercise "good faith," and that in light of the factors set forth in Section 767 of the *Restatement (Second) of Torts*, sufficient evidence was presented to permit a determination by the trier of fact that the NCAA breached its duty.

■ Throughout this litigation, the parties and the lower courts have relied upon Sections 766B, 767, and 773 of the *Restatement (Second) of Torts*. While this Court has never adopted these sections, the Court of Appeals in *Cullen v. South East Coal Co.*, Ky.App., 685 S.W.2d 187 (1983), followed Section 766B and recognized that intentional and improper interference with the prospective contractual relations of another gives rise to liability. Several other Kentucky decisions recognize that contractual relations or prospective contractual relations are protected from improper interference. See *Brooks v. Patterson*, 234 Ky. 757, 29 S.W.2d 26 (1930); *Derby Road Building Co. v. Commonwealth*, Ky., 317 S.W.2d 891 (1958); *Carmichael–Lynch–Nolan, Etc. v. Bennett, Etc.*, Ky.App., 561 S.W.2d 99 (1977); and *Henkin, Inc. v. Berea Bank & Trust Co.*, Ky.App., 566 S.W.2d 420 (1978). Upon examination of our decisions, we conclude that the foregoing sections of the *Restatement* fairly reflect the prevailing law of Kentucky.

Our law is clear that a party may not recover under the theory presented in the absence of proof that the opposing party "improperly" interfered with his prospective contractual relation. To determine whether the interference is improper, Section 767 sets forth seven factors to be considered by the court in ruling on the motion for directed verdict and, if the case is submitted, considered by the jury. Unless there is evidence of improper interference, after due consideration of the factors provided for determining such, the case should not be submitted to the jury. Even if evidence is presented which would otherwise make a submissible case, the party whose interference is alleged to have been improper may escape liability by showing that he acted in good faith to assert a legally protected interest of his own. While the party seeking recovery bears the burden of proving that the interference was improper, the party asserting a right to protect his own interest bears the burden of proving his defense.

As early as 1930 in *Brooks v. Patterson, supra,* this Court recognized "a new and distinct tort which is termed 'interference.'" We denied recovery, however, because there was no evidence that the interfering intermeddler employed some "unlawful means such as fraud, deceit, or coercion." Much later in *Derby Road Building Co. v. Commonwealth, supra,* the *Brooks* rule was slightly modified to permit imposition of liability upon a stranger to an existing contract for wrongfully procuring a party to the contract not to perform. We said "such liability is predicated upon an intentional interference, malicious and without justification, with known contractual rights." In our next significant encounter with the law of interference, *Carmichael–Lynch–Nolan, Etc. v. Bennett, Etc., supra,* the Court of Appeals stated broadly "the party damaged by interference with his contract rights can recover even though he cannot establish fraud or coercion or a master-servant relationship." Relying on *Derby Road* and the *Restatement,* Section 766, the Court in *Carmichael* nevertheless followed the "malicious and without justification" rule for imposition of

liability. In *Henkin v. Berea Bank & Trust Co., supra,* the Court of Appeals followed *Brooks* in stating that interference accompanied by fraud, deceit or coercion which prevents the making of a contract, is equivalent to interference which induces the breach of an existing contract. The Court further held that "breach of a fiduciary or confidential relationship was on a par with fraud and deceit." *Henkin* at p. 425.

Finally, we turn to our most recent authority and the authority most nearly on point, the decision of the Court of Appeals in *Cullen v. South East Coal Co., supra.* The facts in *Cullen* are that a physician mistakenly sent an employer, who maintained an employee health care plan, a bill for medical services which were not rendered. In a subsequent telephone conversation between the physician and the employer's representative, an argument occurred and the conversation ended with a threat of retaliation against the physician. Later the same day, the employer sent a memorandum to all of its employees covered by the health care plan informing them that Dr. Cullen was no longer an approved physician and that "no bills will be accepted from Dr. Cullen after this date." In affirming the trial court's directed verdict against Dr. Cullen, the Court of Appeals recognized Section 766B of the *Restatement* as leading authority in cases alleging intentional interference with a prospective contractual relationship. In analyzing the meaning of the phrase "and improperly interferes," the Court directed consideration to the interfering party's motive, the interest that party sought to promote or protect, the means of interference, and whether or not malice was shown. Based upon these criteria and the evidence presented, the trial court and the Court of Appeals held that no liability existed. While the Court in *Cullen* made no express reference to Sections 767 and 773 of the *Restatement,* the concepts embodied in those sections clearly appear in *Cullen.* The facts decisive to the outcome were that the means of communication and the communication itself was reasonable and non-li-

belous and that the employer had a right to protect its health care plan from abuse.

■ From these authorities, it is clear that to prevail a party seeking recovery must show malice or some significantly wrongful conduct. In *Prosser and Keeton on Torts* § 130 (W.P. Keeton ed. 5th ed. 1984), this is stated as follows:

[T]he [interference] cases have turned almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it. . . .

[S]ome element of ill will is seldom absent from intentional interference; and if the defendant has a legitimate interest to protect, the addition of a spite motive usually is not regarded as sufficient to result in liability.

It should be noted, however, that just as malice may be inferred from a lack of probable cause in a malicious prosecution action, (*Massey v. McKinley*, Ky.App., 690 S.W.2d 131 (1985) and *Sweeney v. Howard*, Ky., 447 S.W.2d 865 (1969)), malice may be inferred in an interference action by proof of lack of justification. *Smith Development Corporation v. Bilow Enterprises, Inc.*, 112 R.I. 203, 308 A.2d 477 (1973); *Restatement (Second) of Torts*, § 766 Comment S (1979) (". . . [T]he context and the course of the decisions make it clear that what is meant is not malice in the sense of ill will but merely 'intentional interference without justification.' ").

■ Returning to the evidence, the most significant fact presented by Hornung was that after the vote, Crowder was mentioned as a possible announcer by two members of the Committee in a hallway discussion with Wussler and Hanson. Hornung argues that from this it may be inferred that he was rejected so that Crowder could have the job. Even if this incident stood alone, which it does not, and there was no other evidence to explain the action of the Committee, such an inference would not be reasonable. After all, the Committee had seventeen other members and, despite the presence of Wussler and Hanson at the meeting, there was no evidence of improper influence upon the deliberations. No evidence was presented that the other members of the Committee had any knowledge of the hallway conversation or that the two spoke on behalf of the Committee.

Moreover, Hallock explained the reasons for the Committee's rejection of Hornung as "the unfortunate episode in his professional playing career when he was suspended by the NFL for gambling activity," the inconsistency between the image the NCAA sought to promote and the image of Hornung portrayed in the Miller Lite Beer commercial, and the opinion that Hornung was too closely associated with professional football. Hornung argues that these reasons are subterfuge, but nothing more than speculation was presented to contradict the reasons given.

It is undisputed that during his professional football career Hornung was suspended for gambling activity and that in the Miller Lite Beer commercial, Hornung was portrayed as a playboy. These were certainly legitimate matters for consideration by the NCAA. In view of Hornung's long and outstanding career in the National Football League, it is not unreasonable to hold the opinion that he is more closely associated with professional football than college football. Contrary to Hornung's argument, its acceptance of advertising revenue from the Miller Brewing Company does not render the NCAA's objection to the commercial incredible. The objection was not Hornung's promotional activity on behalf of the brewing company; it was the image portrayed in the commercial. Likewise, Hornung's previous broadcast of college football games is irrelevant as the NCAA did not have "announcer approval rights" as it had here. Finally, Hallock's vote in 1985, three years after the Committee vote, in favor of Hornung's election to membership in the College Football Hall of Fame and the fact that the Committee took only ten minutes to disapprove Hornung do not conflict with the testimony given by Hallock. From the foregoing, we conclude that Hornung failed to prove that the NCAA "improperly" interfered with his prospective contractual relation with WTBS.

Even if our conclusion about improper interference were otherwise, the NCAA would nevertheless prevail upon its defense under *Restatement* Section 773. The NCAA was entitled to assert "in good faith" its right of announcer approval. This right had been bargained for and was an essential element in the contract with WTBS. The NCAA was entitled to assert its right even to the detriment of Hornung's prospective contractual relation. If the NCAA believed that employment of Hornung was contrary to its interest, even if such belief was mistaken, it was justified in disapproving Hornung pursuant to the terms of the agreement with WTBS. *Disher v. Fulgoni,* 161 Ill.App.3d 1, 112 Ill.Dec. 949, 514 N.E.2d 767 (1 Dist.1987).

Prior to concluding this opinion and in view of our decision on the merits, it is appropriate to briefly discuss the standard by which we measure the trial court's order overruling the NCAA's motion for directed verdict.

A motion for directed verdict admits the truth of all evidence which is favorable to the party against whom the motion is made. *Kentucky & Indiana Terminal R. Co. v. Cantrell,* 298 Ky. 743, 184 S.W.2d 111 (1944). Upon such motion, the court may not consider the credibility of evidence or the weight it should be given, this being a function reserved to the trier of fact. *Cochran v. Downing,* Ky., 247 S.W.2d 228 (1952). Moreover, the trial court should favor the party against whom the motion is made with all inferences which may reasonably be drawn from the evidence. Upon completion of the foregoing evidentiary review, the trial court must determine whether the evidence favorable to the party against whom the motion is made is of such substance that a verdict rendered thereon would be "palpably or flagrantly" against the evidence so as "to indicate that it was reached as a result of passion or prejudice." If the trial court concludes that such would be the case, a directed verdict should be given. Otherwise, the motion should be denied. *Nugent v. Nugent's Ex'r.,* 281 Ky. 263, 135 S.W.2d 877 (1940).

Upon a thorough review of the evidence, we conclude that the verdict of the jury was without a sufficient evidentiary basis. Accordingly, the decisions of the courts below are reversed with directions for entry of a judgment for the NCAA.

STEPHENS, C.J., and GANT, LEIBSON and WINTERSHEIMER, JJ., concur.

STEPHENSON and VANCE, JJ., concur in result only.