RENDERED: APRIL 18, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

**FINAL**

2017-SC-000541-DG **DATE** 5/9/19 Kim Redmon, DC

KEITH RANDALL SPARKMAN, D/B/A          APPELLANT
IN-DEPTH SANITARY SERVICE GROUP

ON REVIEW FROM COURT OF APPEALS
V.       CASE NOS. 2009-CA-001926-MR AND 2009-CA-002123-MR
KNOTT CIRCUIT COURT NO. 06-CI-00060

CONSOL ENERGY, INC. AND          APPELLEES
CONSOL OF KENTUCKY, INC.

## OPINION OF THE COURT BY JUSTICE VANMETER

## AFFIRMING

For a party to be liable for tortiously interfering with a contractual relationship, said party must intentionally and improperly interfere with another's existing or prospective contractual relation. The issue before this Court today is whether a parent company may be held liable for tortious interference with a contractual relationship between its wholly-owned subsidiary and a third party. By following our adherence to the Restatement (Second) of Torts (1979) on this issue, we hold that a parent company has a qualified privilege to interfere with the contractual relations of its wholly-owned subsidiary unless it employs wrongful means, or its interference is not in the economic interest of the subsidiary. Accordingly, we affirm.

## I.   Factual and Procedural Background.

Keith Sparkman, doing business as the sole proprietor of In-Depth Sanitary Services Group ("Sparkman"), entered into several business arrangements to provide janitorial services at the "Jones Fork," "Mill Creek," and "Slope Mine" mining operations of CONSOL of Kentucky, Inc. ("CKI"). CKI is the wholly-owned subsidiary of CONSOL Energy, Inc. ("Energy"). In late 2004, Sparkman hired Amy Little on to his cleaning crew. In February 2005, two of Sparkman's contracts were cancelled prior to their natural expiration. The original termination letter did not give a reason for the termination of the contracts. On March 1, 2005, a day after the termination of two of Sparkman's contracts, Little was hired to take over the janitorial duties at both operations. Sparkman's final contract was terminated in June 2005, after he was deemed a security risk for attempting to record multiple conversations with CKI and Energy employees. In the final termination letter, Craig Campbell, a human resources supervisor, stated that the initial two contracts were terminated due to Sparkman's "failure to satisfactorily perform his work and failure to correct the deficiencies after notice of the same."

In 2006, Sparkman brought suit against CKI, Energy, three employees at the operations where Sparkman had contracts, and Little. The case was tried in 2009 on three separate claims. First, Sparkman had two year-to-year contracts and one month-to-month contract, and Sparkman alleged that CKI breached the contracts by terminating them early without cause. The jury decided for Sparkman on this claim and awarded him $34,500. The second

2

claim was that CKI interfered with the contractual relation between Little and Sparkman. CKI received a directed verdict on this issue at trial.[1]

Lastly, Sparkman claimed that Energy interfered with the contractual relationship between Sparkman and CKI by terminating his contracts and giving them to Little at the request of Clell Scarberry, a mine foreman, who was having an extramarital affair with Little.[2] This claim survived a directed verdict motion at trial, and the jury found for Sparkman on the issue, awarding him $678,000 for tortious interference, pain and suffering, and punitive damages. The trial court denied Energy's JNOV motion, and after an initial appeal resulted in a reversal on a procedural issue, this Court remanded to have the Court of Appeals review the issues on the merits. On remand, the Court of Appeals opined that a parent company cannot tortiously interfere with a wholly-owned subsidiary unless it employs wrongful means when interfering. Further, the Court of Appeals held that the affair between Little and Scarberry, and Scarberry's request to move the contract from Sparkman to Little did not amount to wrongful means, and therefore, Energy was privileged to interfere.[3] This appeal followed.

---

[1] Sparkman does not present any argument before us concerning the trial court's directed verdict on this issue.

[2] Scarberry and Little had married by the time of trial, so some references to her in the record refer to an "Amy Scarberry."

[3] The Court of Appeals also held that CKI breached the contracts it held with Sparkman. Since the Court of Appeals decision, CKI has paid the breach of contract damages and does not appeal that decision.

## II.  Standard of Review.

When a denial of a JNOV motion is appealed,

> we are to affirm unless there is a *complete absence of proof on* a
> material issue in the action, or if no disputed issue of fact exists
> upon which reasonable men could differ.  Likewise, the trial court
> is vested with a broad discretion in granting or refusing a new trial,
> and this Court will not interfere unless it appears that there has
> been an abuse of discretion.

*Storm v. Martin*, 540 S.W.3d 795, 800 (Ky. 2017) (citation omitted).

## III.  Analysis.

The issue we must ultimately decide is whether a parent corporation has the authority to interfere with its wholly-owned subsidiary's contracts.  This Court has always followed the Restatement (Second) of Torts (1979) approach to tortious interference claims.  *See Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988) (finding that the Restatement (Second) "fairly reflect[s] the prevailing law of Kentucky[]").  Section 769 of the Restatement (Second) of Torts provides that a third party who has a financial interest in the business of another may interfere with the contractual relations of that business if he "(a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation."

Although an issue of first impression in the Commonwealth, several jurisdictions have decided the issue before us today.  In *Waste Conversion Sys., Inc. v. Greenstone Indus. Inc.*, 33 S.W.3d 779, 780 (Tenn. 2000), the Supreme Court of Tennessee held that a parent corporation has the privilege to interfere in the contracts of its wholly-owned subsidiary unless it (1) employs wrongful

4

means or (2) acts contrary to its subsidiary's interests. *See, e.g., Boulevard Assoc. v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1036 n.3 (2d Cir. 1995) (finding that courts have "uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform," but recognizing an exception when the plaintiff proves improper motive or improper means); *Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 782 F.2d 781, 783 (8th Cir. 1986) (Missouri law dictated that a parent corporation may interfere with its subsidiary's contractual relations unless the parent employs wrongful means or acts for an improper purpose); *MGP Ingredients, Inc. v. Mars, Inc.,* 465 F. Supp.2d 1109, 1115 (D. Kan. 2006) ("parent corporation cannot be held liable for tortious interference when it directs its wholly-owned subsidiary to breach a contract that [] is no longer in the subsidiary's economic interest to perform unless the parent corporation employs wrongful means or acts with an improper purpose[]"); *T.P. Leasing Corp. v. Baker Leasing Corp.,* 732 S.W.2d 480, 483 (Ark. 1987) ("a parent corporation's privilege permits it to interfere with another's contractual relations when the contract threatens a present economic interest of its wholly owned subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose[]").

Based on the weight of authority in other jurisdictions and this Court's adherence to the Restatement (Second) of Torts on this issue, we hold, as a matter of law, that a parent corporation has a privilege to interfere in the contractual relations of its wholly-owned subsidiary, unless it employs

5

wrongful means or acts contrary to its subsidiary's interests.[4] Furthermore, in following the Tennessee approach, the burden is on the plaintiff to prove wrongful means. *Waste Conversion Sys.*, 33 S.W.3d at 780. Based on the evidence the plaintiff set forth at trial, we must now determine whether Clell Scarberry's affair with Amy Little, which allegedly led to the subsequent termination of Sparkman's contract, constitutes wrongful means.

Wrongful means is "defined to include acts which are wrongful in and of themselves, such as misrepresentations of facts, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law." *Id.* at 784 (citations omitted); *see also* Restatement (Second) of Torts § 769 cmt. d (referring back to wrongful means stated in § 767 cmt. c, which include physical violence, misrepresentation, prosecution of civil suits, criminal suits, violations of recognized ethical codes, and other unlawful conduct). Even following Sparkman's theory at trial—an alleged affair and a favor to an employee's girlfriend—none of Energy's acts constituted "wrongful means" as contemplated by the Restatement and other jurisdictions. At most, Energy's employees' interference with CKI's contracts was in an attempt to benefit Little, not harm Sparkman. Furthermore, the other reasons Sparkman

---

[4] Energy urges us to follow *Kamdem-Ouaffo v. Task Mgmt. Inc.*, which held that a tortious interference claim could not be brought against Task Management because it was a party to the contract. No. 1:17-cv-7506 (NLH/JS), 2018 WL 3360762, at *23 (D. N.J. July 9, 2018). However, the plaintiff in *Task Management* signed an agreement **directly** with Task Management. Therefore, notwithstanding Judge Hillman's well-written, cogent analysis, this case does not apply to our analysis of whether a parent corporation may interfere in the contractual relations of its subsidiary.

gives for why wrongful means were employed—veiled threats by Energy employee, Jimmy Childers, and the "pretextual" reasons in the June termination letter for terminating his original two contracts—occurred **after** his first two contracts were terminated and cannot be used to establish acts constituting wrongful means as to the alleged interference with **previously terminated** contracts.

## IV. Conclusion.

This Court has never strayed from the Restatement (Second) of Torts when analyzing tortious interference claims and does not elect to do so today. When alleging tortious interference on the part of a parent corporation with its wholly-owned subsidiary, the plaintiff has the burden of showing that the parent employed wrongful means or acted contrary to its subsidiary's interest. An alleged affair and a favor to an employee's girlfriend do not equate to wrongful means. Therefore, at trial, Sparkman adduced no proof as to the required element of wrongful means in a tortious interference claim involving a parent and its wholly-owned subsidiary. Accordingly, we affirm the Court of Appeals.

Minton, C.J.; Hughes, Keller, and VanMeter, JJ., concur. Lambert, J., concurs in result only. Buckingham, J., not sitting. Wright, J., dissents by separate opinion.

WRIGHT, J., DISSENTING: I respectfully dissent from the majority and would reverse the Court of Appeals and reinstate the Knott Circuit Court's judgment. I fully agree with the majority's excellent analysis of the law but

7

must dissent based on the facts of the case. The jury had sufficient evidence to support their determination that CONSOL Energy, Inc., ("Energy"), interfered with the contractual relationship between its wholly-owned subsidiary and Appellant. The interference violated the economic interest of the subsidiary and used wrongful means.

The majority correctly holds that "[t]his Court has always followed the Restatement (Second) of Torts (1979) approach to tortious interference claims . . . . Section 769 of the Restatement (Second) of Torts provides that a third party who has a financial interest in the business of another may interfere with the contractual relations of that business if he '(a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation.'" The majority cites several cases from our sister states that hold this provision to mean that a parent corporation does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest unless the parent corporation employs wrongful means or acts with an improper purpose. *Waste Conversion Sys., Inc. v. Greenstone Indus. Inc.,* 33 S.W.3d 779 (Tenn. 2000), *Boulevard Assoc. v. Sovereign Hotels, Inc.,* 72 F.3d 1029 (2d Cir. 1995), *Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 782 F.2d 781 (8th Cir. 1986), *MGP Ingredients, Inc. v. Mars, Inc.,* 465 F. Supp.2d 1109 (D. Kan. 2006).

The majority holds "that a parent corporation has a privilege to interfere in the contractual relations of its wholly-owned subsidiary, unless it employs wrongful means or acts contrary to its subsidiary's interests." First, let us

8

examine whether directing the subsidiary corporation to breach its contracts with Appellant was in the subsidiary's economic interest. There was sufficient proof for the jury to find that the Appellant's contracts were terminated because an employee of Energy was having a sexual affair with Little, an employee of Appellant, who was given the contracts the day after Appellant's contracts were terminated.

Testimony was presented that Little told Minister Cecil Leo Slone that she had slept with the main boss to get the Appellant's job. Does the subsidiary gain any economic benefit by terminating contracts so that the contracts can be immediately awarded to a woman because she was having a sexual affair with one of Energy's employees? No. Instead of an economic benefit, the subsidiary was found liable for breach of contract and damages of $34,500 were ordered against it. These damages were upheld by the Court of Appeals and were not appealed to this court.

The reason for Energy to interfere with its subsidiary's contracts was that its employee, in a powerful boss position, was having a sexual affair with the woman. Energy then gave the same contracts to the woman having a sexual affair with one of its bosses the day after it terminated Appellant's existing contracts. What economic benefit was gained by terminating the Appellant's contracts and awarding the same contracts to the woman having a sexual affair with one of the bosses? Energy's interference with Appellant's contracts fails to provide any economic benefit to Energy or its subsidiary. The consequence of Energy's interference with its subsidiary's contracts was that the subsidiary

9

was liable for breach of contract, had to pay damages of $34,500 and incurred substantial litigation costs. Energy's interference with its subsidiary's contracts was obviously without any benefit and was a violation of the subsidiary's economic interest.

The next issue is whether Energy used improper means to interfere in its subsidiary's contracts. Again, I agree with majority's analysis of the law that a parent corporation may interfere with a subsidiary's contracts,

> but recognizing an exception when the plaintiff proves improper motive or improper means; *Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 782 F.2d 781, 783 (8th Cir. 1986) (Missouri law dictated that a parent corporation may interfere with its subsidiary's contractual relations unless the parent employs wrongful means or acts for an improper purpose); *MGP Ingredients, Inc. v. Mars, Inc.,*465 F.Supp.2d 1109, 1115 (D. Kan. 2006) ("parent corporation cannot be held liable for tortious interference when it directs its wholly-owned subsidiary to breach a contract that [] is no longer in the subsidiary's economic interest to perform unless the parent corporation employs wrongful means or acts with an improper purpose[]"); *T.P. Leasing Corp. v. Baker Leasing Corp.,*732 S.W.2d 480, 483 (Ark. 1987) ("a parent corporation's privilege permits it to interfere with another's contractual relations when the contract threatens a present economic interest of its wholly owned subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose[]").

Is it a wrongful means or improper purpose for Energy to interfere with its subsidiary's contracts to provide income and advancement for a woman because she was having a sexual affair with one of Energy's powerful boss employees? In this age of the #metoo movement, it is difficult to understand how the court could find that financial advancement for a woman and discrimination against a man because the woman is having a sexual affair is anything but a wrongful means or an improper purpose.

10

The wrongful means or improper purpose is established by the fact that sexual discrimination is a violation of federal and state law. Kentucky adopted its own version of the federal Title VII—Equal Employment Opportunity. As we have stated:

> One important purpose of the Kentucky Civil Rights Act was to incorporate the anti-discrimination "policies embodied" in the Federal Civil Rights Acts of 1964 (P.L. 88–352, Title VII—Equal Employment Opportunity) as amended. *See* KRS 344.020(1)(a). It is Title VII of the Federal Civil Rights Act of 1964 which addresses employment discrimination based on "race, color, religion, sex, or national origin." But there are further purposes expressed in the Kentucky statute not specified in the Federal, including "protect [ing] ... personal dignity and freedom from humiliation." KRS 344.020(1)(b).

*Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 817 (Ky. 1992). Suits against employers under both the federal and state laws have succeeded when employers have ignored and allowed discriminatory practices, sexual harassment, and the creation of a hostile work environment.

In this case, the complaint comes from the man who was discriminated against rather than the woman. This is of no consequence. Both the federal and state laws make it clear that they apply equally to both sexes. Whether it is a man or a woman, discrimination is discrimination. Further, the fact that the woman has not *yet* filed a complaint does not rule out the possibility of her realizing in the future that she was abused through these workplace dealings, and then taking action at a later time. We constantly see news accounts of women who were sexually harassed years ago later having a strong need to speak out against the abuse—often in spite of the fact they had received

11

benefits from their job or settlements in which they signed nondisclosure agreements.

The predators who have abused women have used their positions of power, the environment created by the corporations and a large number of enablers (detectives, lawyers, and nondisclosure agreements) to keep their victims quiet so that they can continue to prey on other victims. This has resulted in many victims who suffer for years before they speak out. Will the woman in this case someday speak out and say that she was the victim of abuse? It is impossible for us to know. Whether she does or not, Energy still used the power to interfere in its subsidiary's contracts to reward a woman for having a sexual affair with one of its bosses and discriminated against the man who had a contract with the subsidiary.

Is the discrimination nullified because the discrimination is against the man in this case? Does the man lose his rights because the woman has yet to file a complaint? Is it a proper purpose for a corporation to create an environment where the woman, in Ms. Little's own words, "slept with the main boss to get the Appellant's job?" We must be clear that the answer to these questions is NO!

Therefore, I dissent. I would hold that Energy's interference with its subsidiary's contracts was tortious because it harmed the subsidiary's economic interest by using wrongful means for an improper purpose. I would reverse the Court of Appeals because the jury's findings were supported by sufficient evidence and the Court of Appeals substituted its view of the

12

evidence to vacate the jury's findings and the trial court's judgment. The judgment of the Knott Circuit Court should be reinstated.

COUNSEL FOR APPELLANT:

Adam Peter Collins
COLLINS, COLLINS & CONLEY, PSC

Nicholas C. A. Vaughn
LAW OFFICE OF NICK VAUGHN, P.A.

COUNSEL FOR APPELLEES:

Virginia Hamilton Snell
Thomas Travis
WYATT, TARRANT & COMBS, LLP