RENDERED: DECEMBER 15, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0426-DG
2020-SC-0310-DG


HALEY BELT                                   APPELLANT/CROSS-APPELLEE


                    ON REVIEW FROM THE COURT OF APPEALS
V.                          NO. 2017-CA-0155
                         BULLITT CIRCUIT COURT
                    NOS. 11-CI-01465 & 12-CI-00795


CINCINNATI INSURANCE COMPANY              APPELLEE/CROSS-APPELLANT



**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**AFFIRMING**

Cincinnati Insurance Company ("CIC") brought a declaratory judgment action disputing coverage under a commercial general liability policy insuring K-2 Catering, LLC ("K-2") for claims made by Haley Belt arising out of a utility terrain vehicle (UTV) accident that occurred during a social event hosted by K-2's member-managers at their home. This declaratory judgment action culminated in a judgment declaring coverage under the CIC policy for Belt's claims made against K-2. CIC did not appeal from this judgment and paid Belt the policy limits available under the K-2 policy.

While CIC's declaratory judgment action was pending, Belt brought a separate action against K-2 and CIC, alleging K-2's negligence and CIC's bad faith in the settlement of her claims under K-2's policy. The trial court severed

Belt's bad faith claims from her negligence claims. Belt settled her negligence claims, and her bad-faith claims against CIC ended in a jury trial. The jury found that CIC handled Belt's claim in bad faith and returned a verdict against CIC resulting in a judgment against CIC for $4,583,472.39 in compensatory and punitive damages.

CIC appealed the judgment, and the Court of Appeals reversed, finding that the trial court erred by failing to grant CIC a directed verdict on Belt's bad-faith claims.

We granted Belt's motion for discretionary review and CIC's cross-motion for discretionary review to clarify the legal standard for analyzing a motion for directed verdict on a bad faith claim. We affirm the result reached by the Court of Appeals. We hold that *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993), established the applicable legal standard for both common law and statutory bad-faith claims. Accordingly, the trial court erred when it failed to apply that standard and grant a directed verdict for CIC.

## I. FACTUAL AND PROCEDURAL HISTORY

Chuck and Melissa Kersnick were the member-managers of K-2 Catering, LLC. On August 5, 2011, the Kersnicks purchased a UTV. The next day, the Kersnicks hosted an event at their home during which they allowed Zachary, their teenage son, to give rides to guests on the UTV. While giving a ride to Haley Belt and several other individuals, Zachary crashed the UTV. As a result of the accident, Belt sustained permanent and disfiguring injuries.

2

On August 16, 2011, the Kersnicks filed claims resulting from the August 6 accident with CIC, K-2's commercial general liability insurer, and Employers Mutual Casualty (EMC), the Kersnicks' homeowners' insurer. CIC began investigating the accident and collecting statements from the Kersnicks to determine whether coverage under the policy existed for the August 6 accident. On October 12, 2011, CIC sent a reservation of rights letter to the Kersnicks regarding the coverage issues. The letter outlined the relevant policy terms and explained that unsettled issues provided a basis for disputing coverage of the claim. The letter encouraged the Kersnicks to provide any additional relevant information to CIC to aid in the investigation of the claim and coverage determination.

December 1, 2011, CIC filed a declaratory judgment action against K-2, the Kersnicks, Belt, and EMC to determine whether coverage existed under the policy. EMC filed an Answer, Counterclaim, and Cross-Claim alleging that the August 6 accident was outside the coverage of the Kersnicks' homeowners' insurance policy.

On July 12, 2012, Belt filed a complaint against K-2 and Chuck, Melissa, and Zachary Kersnick, alleging negligence and negligent entrustment and seeking compensatory and punitive damages. At that time, CIC sent a supplemental reservation of rights letter to the Kersnicks, informing them that

it would provide them a defense to Belt's suit, reserving its right to dispute coverage later.[1]

On September 26, 2012, the trial court consolidated Belt's separate action with CIC's pending declaratory judgment action.  On April 23, 2013, Belt filed a First Amended Complaint, adding claims against CIC and EMC for common law bad faith and statutory bad faith under the Kentucky Unfair Claims Settlement Practices Act (KUCSPA) and the Kentucky Consumer Protection Act (KCPA).  Belt sought compensatory damages, punitive damages, and attorney's fees and costs. In September 2013, the trial court granted CIC's motion to bifurcate the coverage and bad-faith claims.

On January 22–25, 2014, the trial court held a bench trial in the coverage action. On February 28, 2014, the trial court ruled, finding coverage under both CIC's and EMC's policies.  Neither CIC nor EMC appealed the trial court's decision, and both companies paid policy limits to Belt following the trial court's ruling.

In April 2014, Belt settled with K-2, Chuck and Melissa Kersnick, and Zachary Kersnick.  As a part of the consideration offered in the settlement, K-2 and the Kersnicks assigned their potential bad-faith claims, KUCSPA claims, and KCPA claims against CIC and EMC to Belt.  On May 6, 2015, the trial

---

[1] CIC anticipated that EMC would provide coverage counsel to Zachary Kersnick, but when EMC refused to do so, CIC hired separate counsel to represent Zachary.

court entered an agreed order of partial dismissal, releasing EMC from the litigation.

Belt's bad-faith claims against CIC were tried before a jury. Before the case was submitted to the jury, CIC moved for a directed verdict on the grounds that Belt had failed to provide evidence from which a reasonable jury could conclude that CIC acted in bad faith. The trial court denied CIC's motion.

The trial court instructed the jury on the elements provided in the KUCSPA. The trial court also instructed the jury that "Belt must also show that Cincinnati Insurance Company either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed."

The jury returned a verdict in Belt's favor, awarding her $1,000,000 for emotional pain and mental anguish, $43,472.39 in litigation costs, $3,500,000 in punitive damages, and $40,000 to Chuck and Melissa Kersnick for emotional pain and anguish. The trial court entered judgment accordingly.

On appeal, the Court of Appeals held that the trial court erred as a matter of law by failing to grant CIC a directed verdict. The Court of Appeals held that coverage, the first element of the *Wittmer* test, was not established until after the trial court's judgment in the declaratory judgment action, and CIC promptly paid policy limits to Belt in accordance with the judgment, so CIC was entitled to a directed verdict on the matter of coverage. The Court of

Appeals vacated the jury's verdict and remanded the case for dismissal. This appeal now follows.

## II.   STANDARD OF REVIEW

When a trial court is faced with a motion for directed verdict, it "must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion."[2]  Viewed through that lens, the trial court should grant a directed verdict only when "there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ."[3]  On appellate review, we will reverse the trial court's ruling only if we find that the jury could not have "reasonably reached its verdict on the basis of the evidence before it."[4]

## III.   ANALYSIS

The issue of whether CIC was entitled to a directed verdict is inextricably linked with another issue CIC brings in its cross-motion—the proper jury instructions for common law and statutory bad faith claims.  In reviewing a trial court's ruling on a motion for directed verdict, we consider whether it would be clearly unreasonable for the jury to find for the non-moving party, in light of the totality of the evidence.[5]  In order to determine the reasonableness

---

[2] *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014) (quoting *Bierman v. Klapheke*, 967 S.W.2d 16, 18 (Ky. 1998)).

[3] *Id.*

[4] *Ellison v. R & B Contracting, Inc.*, 32 S.W.3d 66, 75 (Ky. 2000).

[5] *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

6

of the jury's potential finding, we look to the elements of the claim brought.[6]

We note that "the directed-verdict question is not controlled by the law as framed in the jury instructions," but by the statutes and case law creating the cause of action.[7] So we must first identify the proper elements of common law and statutory bad faith claims before deciding whether CIC was entitled to a directed verdict as a matter of law.

## A. The elements of a common law or statutory bad faith claim are those defined in *Wittmer*.

Kentucky courts have recognized the inclusion of an implied covenant of good faith and fair dealing in all insurance contracts.[8] This covenant requires the insurer to, among other things, protect the insured from "the risk of having a judgment rendered against him greatly in excess of the policy."[9] Both named insureds (first parties) and liability plaintiffs (third parties) may bring common law bad-faith claims against insurers for acting in bad faith in the settlement of claims under a policy.[10]

---

[6] *Acosta v. Commonwealth*, 391 S.W.3d 809, 816 (Ky. 2013) (internal citation omitted), *overruled on other grounds by Ray v. Commonwealth*, 611 S.W.3d 250 (Ky. 2020).

[7] *Id.*; *cf. Harper v. Univ. of Louisville*, 559 S.W.3d 796, 810 (Ky. 2018) (holding that a motion for directed verdict could not be supported by a violation of the FWA that was not described in the jury instructions because the propriety of the court's jury instructions was not challenged).

[8] *Manchester Ins. & Indem. Co. v. Grundy*, 531 S.W.2d 493, 498 (Ky. 1975) ("[W]hile the specific language will not be found in the contract it is there by operation of law.") (quoting *Terrell v. Western Cas. & Surety Co.*, 427 S.W.2d 825, 827 (Ky. 1968)); *see also Germania Ins. Co. of New York v. Rudwig*, 80 Ky. 223, 235 (Ky. 1882); *Continental Ins. Co. v. Vallandingham & Gentry*, 76 S.W. 22, 24 (Ky. 1903).

[9] *Manchester*, 531 S.W.2d at 498.

[10] *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 177-78 (Ky. 1989) (recognizing an insured's recovery against his own insurer for bad faith); *Manchester*,

In 1950, Kentucky enacted Kentucky Revised Statute (KRS) 304.12-230 et seq., the Kentucky Unfair Claims and Settlement Practices Act (KUCSPA).[11] The act prohibits unfair claims settlement practices to protect the public from unfair trade practices and fraud.[12] When applied in conjunction with KRS 446.070, the KUCSPA creates a statutory cause of action under which both first and third parties may bring claims against an insurer.[13]

Similarly, in 1972, Kentucky enacted KRS 367.170, the Kentucky Consumer Protection Act (KCPA). This act makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" Additionally, KRS 367.220 authorizes a statutory cause of action for violations of the KCPA.[14] This Court has found the KCPA applicable to insurance contracts and prohibitive of bad faith on the part of an insurer in performing its duties under the contract.[15]

---

531 S.W.2d at 498 (holding that, under the principle of privity of contract, an insured may assign his bad faith claim against his insurer to the liability plaintiff in exchange for a release of the insured from liability in excess of policy limits).

[11] When first adopted, the KUCSPA was codified at KRS 304.915 *et seq.*

[12] *State Farm Mut. Auto. Ins. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988).

[13] *Id.*

[14] "Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170, may bring an action under the Rules of Civil Procedure in the Circuit Court in which the seller or lessor resides or has his principal place of business or is doing business, or in the Circuit Court in which the purchaser or lessee of goods or services resides, or where the transaction in question occurred, to recover actual damages."

[15] *Stevens v. Motorist Mut. Ins. Co.*, 759 S.W.2d 819, 820 (Ky. 1988) (holding that the purchase of an insurance policy is the purchase of a "service" as defined by the KCPA).

Ordinarily, a third party cannot maintain a claim against an insurer under the KCPA because the statutory language of KRS 367.220 limits standing under the Act to those persons who purchased the good or service in question—in this case, the insurance policy.[16] But a bad-faith claim under the KCPA is a statutory tort that arises out of a contractual relationship and, as such, is assignable.[17] So, as in Belt's case, the insured may assign a claim arising under the KCPA to a liability plaintiff.

The gravamen of the KUCSPA and the KCPA (as it applies to insurance contracts) is that an insurer is required to deal with the insured or third-party claimant in good faith.[18] Although the KUCSPA provides a list of improper practices, the offenses listed are merely "technical violations."[19] Such "technical violations" are contractual claims that cannot form the basis of a private cause of action for tortious misconduct rising to the level of bad faith.[20] Instead, a showing of intentional misconduct or reckless disregard of the rights of an insured is a prerequisite to the submission of a KUCSPA or KCPA claim and a jury instruction on punitive damages.[21]

In *Wittmer v. Jones*, this Court clarified the appropriate elements of both statutory and common law first- and third-party bad-faith claims:

---

[16] *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 451 (Ky. 1997).

[17] *Associated Ins. Service, Inc. v. Garcia*, 307 S.W.3d 58, 62 (Ky. 2010).

[18] *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 26 (Ky. 2017); *Stevens*, 759 S.W.2d at 821-22.

[19] *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993).

[20] *Id.*

[21] *Id.*

[A]n insured must prove three elements in order to prevail against an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.[22]

So in considering CIC's motion for a directed verdict on Belt's bad-faith claims, the trial court was required to determine, considering the evidence provided in a light most favorable to Belt, whether a reasonable juror could conclude that CIC was obligated to pay the claim under the terms of K-2's policy; that CIC lacked a reasonable basis in law or fact for denying K-2's claim; and that CIC knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. If the trial court found that, under the evidence presented, a reasonable juror could find all three *Wittmer* elements to be satisfied, the trial court should have denied CIC's motion for directed verdict.  But if Belt failed to produce sufficient evidence to persuade a reasonable juror on any one of the three elements, the trial court was required to grant a directed verdict in CIC's favor.

---

[22] *Id.* (quoting *Federal Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 846-47 (Ky. 1986) (Leibson, J., dissenting) *overruled by Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176 (Ky. 1989) (overruling *Federal Kemper*'s majority opinion and adopting Justice Leibson's dissent)).

**B. The trial court erred in denying CIC's motion for a directed verdict.**

With the appropriate elements of a bad-faith claim identified, we now consider the evidence admitted at the bad-faith trial and analyze whether it satisfied the standard of proof outlined in *Wittmer*.

### 1. Coverage existed under K-2's commercial general liability policy with CIC.

CIC filed an action against EMC, the Kersnicks, and K-2 on December 1, 2011, to determine whether coverage existed under CIC and EMC's policies for the August 6, 2011 UTV accident. This action culminated with a bench trial, at which the trial court concluded that coverage existed under both CIC's commercial liability policy and EMC's homeowners' insurance policy for the August 6 UTV accident.

At the bad-faith trial, the court admitted into evidence Plaintiff's Exhibit #47, the trial court's coverage ruling that concluded that the UTV accident was covered under K-2's policy with CIC.[23] This ruling provided conclusive evidence to the jury that coverage existed under the policy in question in the bad faith action. So the first element of the *Wittmer* test was satisfied.[24]

---

[23] One of the cross claims asserted by CIC deals with the propriety of the trial court's admission of the trial court's coverage opinion into evidence. As we resolve the case on other grounds, we need not reach this question today and make no ruling on the propriety of the admission.

[24] The Court of Appeals overturned the jury's verdict on the grounds that Belt failed to satisfy the first element of the *Wittmer* test. But the Court of Appeals conflated elements one and two of the *Wittmer* test, failing to distinguish the actual finding that coverage existed from the reasonable basis under which CIC filed the declaratory judgment action. As such, although we affirm the decision of the Court of Appeals, we do so on different grounds, ultimately finding element one of the *Wittmer* test satisfied and elements two and three unsatisfied.

11

### 2. CIC had a reasonable basis in law and fact for disputing the policy's coverage of Belt's claims.

On August 16, 2011, the Kersnicks provided notice to CIC of a claim under K-2's commercial general liability policy. A copy of the Notice of Claim form was admitted into evidence at the bad-faith trial as Plaintiff's Exhibit #1. There, the Kersnicks informed CIC that the UTV involved in the incident was purchased for business use and that Zachary Kersnick was driving the UTV at the time of the accident.

In email correspondence dated September 7, 2011, CIC Field Claims Manager Chad Dowdy communicated with Paul Braden, CIC Home Office Supervisor, that concerns existed about ownership of the UTV because the UTV was purchased by the Kersnicks individually. As a result, CIC was concerned that coverage for the claim might not exist under the terms of the policy. These email communications were admitted into evidence at the bad-faith trial as Plaintiff's Exhibit #2. Outside of the ownership of the UTV, the emails expressed concern that the accident occurred outside the course and scope of K-2's business and thus may not be covered by the policy. Lastly, the emails questioned the nature of the event held by the Kersnicks and whether it was a part of K-2's business.

In email correspondence dated September 8, 2011, CIC Field Adjustor Jessica Hawkins communicated with Melissa Kersnick to obtain more information about the claim. These emails were admitted into evidence at the bad-faith trial as Plaintiff's Exhibit #9. Melissa stated that the event was not K-2 business in the sense that they were not preparing and selling funnel

12

cakes. Melissa stated that she discussed scheduling some shifts for K-2 with guests at the event. Melissa stated that the food at the event was prepared by a person who sometimes works for K-2, and that the tent, grill, and tables used at the event belong to K-2. Melissa stated that her husband intended to pay some of the boys at the event for helping to set up the event, but payment never occurred because of the accident. Melissa recounted to Hawkins that, at the event, Melissa told an attendee: "I guess today is K-2's company picnic."

On September 15, 2011, Melissa and Chuck Kersnick were formally interviewed by Jessica Hawkins to collect more information regarding their claim. A transcript of this interview was admitted into evidence at the bad-faith trial as Plaintiff's Exhibit #7. At that interview, they stated that they intended the UTV to be owned by K-2, although the vehicle was titled and financed in their names individually. They also stated that they authorized Zachary to give rides to his friends on the UTV, but they told him to stay in the yard. At this interview, Melissa and Chuck described the August 6 event as a social event—a birthday party for Melissa. They stated that guests brought food to share potluck-style and that Chuck provided some food for guests as well. Lastly, they stated that several of K-2's employees were at the event and assisted with grilling, but that they were not paid for their work.

In email correspondence between Mike Risley, CIC's outside coverage counsel, and Jessica Hawkins, concern was expressed that Zachary was not an insured under CIC's policy. This email communication was admitted into evidence at the bad-faith trial as Plaintiff's Exhibit #10. Risley stated that even

13

if Zachary was found to be covered under the policy, because he exceeded the authorized scope of use of the UTV, his use of the UTV likely exceeded the scope of the policy's coverage. They concluded that the ownership of the UTV itself was a question of the purchaser's intent. The original purchase documents for the UTV did not contain any mention of K-2, but Melissa admitted to altering the documents herself to list K-2 as a co-owner after the August 6 accident occurred. Risley and Hawkins felt that this discrepancy created a question of material fact as to the intended ownership of the UTV at the time of the accident. The conversation concluded with factual and legal uncertainty regarding coverage of the accident under K-2's policy.

Finally, on October 7, 2011, Risley provided a coverage opinion letter to CIC. This letter was admitted into evidence at the bad-faith trial as Plaintiff's Exhibit #12. In this letter, Risley stated that K-2 was the named insured and therefore was an insured under the policy. He stated that neither the policy's auto exclusion nor its mobile-equipment exclusion would likely apply to exclude the UTV accident from coverage under the policy. But he stated that Zachary was likely not an insured under the policy, regardless of whether he could be considered an employee of K-2.[25] He stated that Chuck and Melissa Kersnick were insureds under the policy only if the claims against them related

_____

[25] In the letter, Risley distinguished CIC's policy from an ordinary automobile liability policy. According to Risley, in an ordinary automobile liability policy, the definition of an "insured" under the policy generally includes anyone operating the vehicle with the insured's permission. In the case of K-2's commercial liability policy, an insured is only defined as an employee acting within the scope of K-2's business. Risley concluded that because Zachary was acting outside the scope of K-2's business in driving the UTV, he is not an insured under the CIC policy.

14

to the conduct of K-2's business. He concluded that the ownership of the UTV was a factual issue that was important in the determination of coverage, because, if the UTV was owned by K-2, then Chuck and Melissa's allowing someone to use the UTV could constitute the conduct of K-2's business. Lastly, Risley identified a novel legal question of coverage presented by an LLC member's authorization of use of company-owned property for non-company business. Overall, Risley recommended CIC file a declaratory judgment action to resolve the coverage issues described in his letter.

These exhibits provided ample evidence that CIC had a reasonable basis in fact for disputing coverage of Belt's claims. The ownership of the UTV, the purpose of the August 6 event, Zachary's role at the event, and the role played by K-2 at that event were all unsettled factual questions that, coupled with the recommendation of outside counsel, justified CIC's declaratory judgment action seeking a decision on coverage.

Additionally, CIC provided substantial evidence that it had a reasonable basis in law for disputing coverage of Belt's claims. The novel legal question presented by the delegation of authority by LLC members to use potentially business-owned property for a non-business purpose presented an unsettled question of law which justified CIC's pursuit of a declaratory judgment regarding coverage.[26]

---

[26] *Travelers Indem. Co. v. Armstrong*, 565 S.W.3d 550, 568 (Ky. 2018) (quoting *Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Serv., Inc.*, 880 S.W.2d 886, 890 (Ky. App. 1994)) ("If a genuine dispute does exist as to the status of the law governing

In the face of the factual evidence admitted at trial, we do not believe that a reasonable juror could conclude that CIC lacked a basis in law or fact for challenging the policy's coverage of Belt's claim.[27] Thus, we find that Belt failed to satisfy the second element of *Wittmer*.

Belt argues that the action finding that coverage existed under K-2's policy provides an evidentiary basis for a reasonable juror to conclude that coverage was not fairly debatable. She asserts that CIC's failure to appeal the coverage action ruling and its willingness to pay Belt policy limits constituted an admission of the unreasonable nature of CIC's challenge to coverage. As this Court has stated before, such an inference is preposterous.[28] "[A]n insurer is entitled to challenge a claim and litigate it if the claim is debatable on the law or facts."[29] We decline to hold that the ultimate finding that coverage exists is dispositive evidence that the coverage action was brought in bad faith. Additionally, a party's litigation strategy to decline to appeal a coverage decision and pay policy limits in accordance with that coverage decision does not constitute evidence of bad faith in bringing the coverage action.

---

the coverage question, the insured's claim is fairly debatable and the tort claim for bad faith based upon the insurer's refusal to pay the claim may not be maintained.").

[27] *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 586 (Ky. 2021) ("[W]hen an insured's liability is unclear, bad-faith claims fail as a matter of law because the insurer has a reasonable basis for challenging the claim.").

[28] *Glass*, 996 S.W.2d at 454.

[29] *Id.*

16

### 3. Belt failed to provide evidence that CIC acted with reckless disregard for whether a reasonable basis existed for denial of Belt's claim.

A claimant bringing a bad-faith claim must provide evidence of "intentional misconduct or reckless disregard of the rights of an insured or claimant to warrant submitting the right to award punitive damages to the jury."[30] Kentucky courts have found such intentional misconduct or reckless disregard in cases in where affirmative evidence showed that an insurer blatantly misrepresented policy provisions to the insured,[31] used the claimant's financial struggles to leverage its bargaining position,[32] focused its investigation on evading paying the claim,[33] or refused to settle a claim until the claimant released the insurer from liability arising from its misconduct.[34]

At trial, Belt failed to offer evidence of any intentional misconduct. First, Belt relied on simple conjecture to argue that CIC's historic losses in the period preceding Belt's claim motivated CIC to deny coverage to avoid further losses. But without affirmative evidence of a causal connection between such losses and the investigation, negotiation, and settlement of Belt's claim, a finding of intentional misconduct or reckless disregard cannot be sustained.

Second, in her brief, Belt provides as evidence of CIC's "reckless disregard" a statement made by CIC Vice President Dennis Stetz that, "no one

---

[30] *Wittmer*, 864 S.W.2d at 890.

[31] *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 377 (Ky. 2000).

[32] *Hamilton Mut. Ins. Co. v. Buttery*, 220 S.W.3d 287, 293 (Ky. App. 2007).

[33] *Id.*

[34] *Id.*

would jump off a bridge for $1 million."[35]  But Belt provided no evidence that Stetz's comment was, in any way, associated with her claim.  Additionally, Stetz's statement was made in a deposition on June 13, 2016, more than four years after CIC filed the declaratory judgment action for determination of coverage under K-2's policy.  A possibly inflammatory statement made by an otherwise unrelated employee of an insurer cannot, alone, prove intentional misconduct or reckless disregard in the administration of an individual's claim.

Lastly, Belt conflates the seriousness of the financial, physical, and psychological effects of her injuries with intentional misconduct by CIC, who she claims recklessly and intentionally delayed settling her claim for two-and-a-half years.  This argument fails for two reasons.

First, "mere delay in settlement does not rise to bad-faith conduct."[36]  So a plaintiff must provide "proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured [or claimant] with respect to the applicable coverage."[37]  Belt provided no evidence of improper motive in CIC's delay in payment of settlement.  Nor did Belt provide evidence that CIC acted to deceive K-2 as to the coverage provided in the policy.  Instead, communications admitted into evidence provide numerous examples of CIC employees clearly communicating

---

[35] We note that Belt's brief alleges Stetz said, "[N]o one would jump off a bridge for $1 million."  But the video record to which Belt cites is the testimony of Britta Moss making reference to Stetz's deposition testimony.  There, Moss alleges that Stetz said, "No one at Cincinnati would jump off a bridge over a million dollars."

[36] *Mosley*, 626 S.W.3d at 588-89.

[37] *Glass*, 996 S.W.2d at 452-53.

18

to K-2 and its counsel the unsettled questions that required resolution in a declaratory judgment action. Overall, an insurer's duty to effectuate a settlement under a policy does not begin until coverage is reasonably clear.[38] As such, CIC's duty to settle with Belt did not arise until the trial court's coverage ruling issued, at which point CIC paid Belt its policy's limits.

Second, CIC was acting within its rights as an insurer in filing a declaratory judgment action to determine whether coverage existed under the policy.[39] Although seeking a declaratory judgment on coverage does not preclude a bad-faith claim, when it is coupled with genuine questions of law and fact that make coverage fairly debatable, the delay in settlement caused by a declaratory judgment action does not expose the insurer to liability for bad faith.[40]

The dissent cites as evidence of CIC's "reckless disregard" the trial testimonies of Britta Moss and Paul Braden as well as CIC's "institutional failure to investigate, inform, or reasonably settle with parties to this claim—given the magnitude of the injury and the number of CIC representatives who failed to comport with industry standards over the course of several years[.]" We find this evidence insufficient for several reasons.

---

[38] *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000) ("The gravamen of the UCSPA is that an insurance company is required to deal in good faith with a claimant, whether an insured or a third-party, with respect to a claim which the insurance company is *contractually obligated to pay.*").

[39] *Guaranty Nat. Ins. Co. v. George*, 953 S.W.2d 946, 949 (Ky. 1997).

[40] *Id.*

First, Moss testifying that CIC's actions were outrageous does not simply make them so. Although CIC may not have investigated and handled Belt's claim in the way that Moss and Belt would have preferred, that does not make CIC's conduct unreasonable, let alone outrageous. As described in CIC's claims file, Plaintiff's Exhibit #2, upon receiving notice of K-2's claim under the policy, CIC investigated the claim and interviewed the claimants. CIC consulted with outside coverage counsel to resolve questions regarding the policy's coverage. Five months after initial notification of the claim, when coverage questions remained unsettled, CIC promptly filed a declaratory judgment action to determine coverage. And when Belt filed suit against K-2 and the Kersnicks, CIC provided a defense to K-2, the Kersnicks, and their son under a reservation of rights. Nothing about CIC's behavior was unusual, let alone reckless or outrageous. In fact, this is the exact course of conduct we expect an insurer to take. Despite Moss's opinion otherwise, we do not find that a reasonable jury applying this Court's precedent could conclude that CIC acted outrageously.

Further, calling an action outrageous does not simply make it so. To hold otherwise would be to grant any expert witness in a bad faith action the ability to define the scope of bad faith under our law. We decline to do so today.

Second, the dissent cites Braden's trial testimony as evidence of reckless disregard for whether a reasonable basis for denying Belt's claim existed. At trial, Braden testified that, following the verdict in the coverage action, he felt

20

indifferent to the court's decision.  The dissent argues that this testimony is evidence from which the jury could conclude that CIC did not intend to abide by the trial court's ruling in the coverage action.  We do not find this testimony to provide reasonable grounds for such an inference.  A single employee's emotional response to a coverage decision does not impute bad faith to the insurer, particularly when that employee did not take, nor is he alleged to have taken, any action based on that emotion.  Although Braden may have been displeased by the verdict on the coverage action, CIC did not appeal the trial court's finding of coverage, and it paid policy limits to Belt.  Thus, CIC in no way failed to abide by the trial court's ruling, and Braden's mere statement about his indifference does not provide a sufficient basis from which a reasonable jury could conclude that CIC acted with reckless disregard for whether a reasonable basis for denial of Belt's claim existed.

The remaining evidence the dissent cites as supporting a finding of "reckless disregard" amounts to alleged violations of the KUCSPA.  However, as previously stated, such "technical violations" are contractual claims that cannot form the basis of a private cause of action for tortious misconduct rising to the level of bad faith.[41]  CIC did not fail to investigate, communicate, or negotiate settlement with Belt, it just did not do so in the ways that Belt would

---

[41] *Wittmer*, 864 S.W.2d at 890.

21

have liked.  Mere alleged deficiencies in undertaking the obligations set out in the KUCSPA cannot, alone, form the basis of a bad faith claim.[42]

Belt simply provides no evidence on which a reasonable jury could conclude that CIC acted with reckless disregard for whether a reasonable basis for denial of Belt's claim existed.  Thus, Belt did not satisfy the third element of the *Wittmer* test.

## IV.  CONCLUSION

Because Belt provided insufficient evidence for a reasonable jury to find two of the three *Wittmer* elements to be satisfied, the trial court should have granted CIC's motion for a directed verdict on all Belt's bad-faith claims, statutory and common law. And considering our holding, we need not address the remaining arguments raised by CIC's cross-appeal.  We affirm the Court of Appeals' holding, albeit on different grounds, and remand this matter to the trial court for dismissal of Belt's claims.

All sitting.  Hughes, Lambert, and VanMeter, JJ., concur.  Keller, J., dissents by separate opinion in which Conley and Nickell, JJ., join.

KELLER, J., DISSENTING:  I respectfully dissent from the Majority's opinion. As elaborated below, Haley Belt put forth evidence sufficient to prove that Cincinnati Insurance Company (CIC) possessed all the information necessary to make a coverage determination in the first two months of having the claim file, that CIC failed to reasonably investigate the claim, that CIC had

---

[42] *See Hollaway v. Direct Gen. Ins. Co. of Mississippi, Inc.*, 497 S.W.3d 733, 739 (Ky. 2016).

22

no justification for its one settlement offer amount, that CIC filed a declaratory judgment action to force a lower settlement, and that CIC repeatedly misrepresented material information to the claimants. If Belt's evidence is taken as true and all reasonable inferences are drawn in Belt's favor—as is required under our standard of review—it is clear that the trial court did not err in denying CIC's motion for a directed verdict.

## I. ANALYSIS

Both sides argue vehemently over how Belt's case aligns with this Court's precedent regarding bad faith. Before detailing the testimony as elicited in this case, I will first review this Court's relevant precedent subsequent to *Wittmer*. *Wittmer v. Jones*, 864 S.W.2d 885 (Ky. 1993). In *Hollaway v. Direct General Insurance Co. of Mississippi, Inc.*, 497 S.W.3d 733 (Ky. 2016), Hollaway alleged bad faith based on an insurer's alleged failure to reasonably negotiate a settlement or investigate a claim. *Id.* at 735. However, the facts underlying the claim, including whether Hollaway's damages actually stemmed from the accident or a prior injury, were in dispute. *Id.* at 735–36. Because of this, when the insurer moved for summary judgment, the trial court granted its motion. *Id.* at 736. The trial court found "that a legitimate dispute existed regarding who had been liable for the accident *and* what injuries to Hollaway were caused by the accident." *Id.* at 735–36. On de novo review of the summary judgment award, this Court affirmed. *Id.* at 740.

This Court similarly affirmed summary judgment granted in favor of an insurer in a bad faith claim in *Mosley v. Arch Specialty Insurance Co.*, 626

23

S.W.3d 579, 582 (Ky. 2021). There, Mosley alleged bad faith despite a legitimate dispute regarding liability precluding settlement. *Id.* at 587. This Court found no error, since "when an insured's liability is unclear, bad-faith claims fail as a matter of law because the insurer has a reasonable basis for challenging the claim." *Id.* at 586.

In *Indiana Insurance Co. v. Demetre*, 527 S.W.3d 12 (Ky. 2017), unlike in the cases above, this Court affirmed the trial court's denial of an insurer's directed verdict motion regarding bad faith. *Id.* at 15. Demetre sought coverage from his insurer, Indiana Insurance Company, for environmental claims brought against him by a family occupying a residence nearby a vacant lot Demetre owned which had previously operated as a gas station. *Id.* at 14–15. In finding in favor of Demetre, we noted that "viewing the evidence in the light most favorable to Demetre," Indiana Insurance engaged in "a sustained effort . . . to deny coverage long after it could and should have determined that it was legally obligated under its contract with Demetre." *Id.* at 30. We further stated that "the evidence readily support[ed] Demetre's contention that Indiana Insurance was far more interested in denying coverage than defending [Demetre] against [the] claims." *Id.* We noted that the resolution of the claim did not proceed without delay despite the coverage question being straightforward. *Id.*

Further, we held that "[t]here was no 'genuine dispute' that Demetre had contracted with Indiana Insurance to insure the . . . property and that the . . . claims arose from alleged contamination caused by that property." *Id.* at 31.

24

We noted that Indiana Insurance was never "able to demonstrate that Demetre had concealed information about possible contamination . . . from his insurer," which was "the premise for the insurer's refusal to acknowledge coverage and [was] a position it eventually abandoned." *Id.* Finally, we explained that "there was clearly insufficient factual support" for the "first-impression legal theories" advanced but eventually abandoned and that the next theory Indiana Insurance advanced "was without any factual justification whatsoever," as acknowledged by an employee at trial. *Id.* at 32. Accordingly, we held that "a reasonable jury could conclude that Indiana Insurance's assertion and prolonged continuation of an ultimately meritless coverage dispute reflected bad faith and caused its insured to endure significant emotional and financial strain." *Id.* at 30.

As can be seen, there are significant factual distinctions between the three cases. In addition to the factual distinctions between *Demetre* and the first two cases above, there is also an important procedural distinction. *Mosley* and *Hollaway* both came to this Court on appeals from summary judgments awarded in favor of insurers. Our standard of review for such issues is below.

> On appeal from summary judgment granted below, we determine whether "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." All factual ambiguities are viewed in a light most favorable to the nonmoving party. And we review all legal conclusions de novo; the lower courts' opinions are entitled to no deference.

*Hollaway*, 497 S.W.3d at 736 (internal citations omitted). By contrast, *Demetre*, like the case at bar, was before this Court on the denial of an insurer's motion for directed verdict. The standard of review for a denial of a directed verdict sets a high bar. In such a review, this Court is prohibited from determining the "credibility or the weight which should be given to the evidence" presented at trial. *Lewis v. Bledsoe Surface Mining Co.*, 798 S.W.2d 459, 461 (Ky. 1990) (citing *Kentucky & Indiana Terminal R. Co. v. Cantrell*, 298 Ky. 743, 184 S.W.2d 111 (1944); *Cochran v. Downing*, 247 S.W.2d 228 (Ky. 1952)). In fact, "[a]ll evidence which favors the prevailing party"—in this case, Belt—"must be taken as true." *Id.* More than just taking the evidence as true, though, "[t]he prevailing party is entitled to all reasonable inferences which may be drawn from the evidence." *Id.*

After drawing reasonable inferences and taking Belt's evidence as true, we then "must determine whether the verdict rendered is palpably or flagrantly against the evidence so as to indicate that it was reached as a result of passion or prejudice." *Id.* at 461–62 (internal quotation marks omitted) (quoting *NCAA v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988)). Only where the jury's result is "palpably or flagrantly against the evidence" may we reverse the trial court's decision to deny a motion for a directed verdict. *Id.* (internal quotation marks omitted). By adopting such a deferential standard, we maintain the sanctity of an awarded jury verdict, rather than take a decision out of the hands of a jury who has already deliberated and decided a case.

Here, Belt alleged bad faith against CIC. To prove a bad faith claim against CIC, Belt needed to satisfy the three *Wittmer* factors. *Wittmer*, 864 S.W.2d at 890. To satisfy those factors, Belt needed to show that CIC was obligated to pay the claim under the terms of the policy, that CIC lacked "a reasonable basis in law or fact for denying" her claim, and that CIC "either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Id.* (citation omitted). Under our standard of review, this Court must determine if Belt put on sufficient evidence supporting each of the three factors in order to survive a motion for directed verdict. *See Demetre*, 527 S.W.3d at 25.

We agree with the majority that Belt established the first of the three *Wittmer* factors. Our analysis thus focuses on the second two. As we elaborate below, there is considerable overlap in evidence for the second and third elements on this bad faith claim.

*A. Element Two*

Under the second element of the *Wittmer* test, Belt needed to show that CIC lacked a reasonable basis in law or fact for denying her claim. *Wittmer*, 864 at 890. This Court need not determine whether that element was actually proven. Instead, it is our duty to determine if Belt entered sufficient evidence to support that conclusion. Put a different way, the question is not whether evidence supported a conclusion that CIC *had* a reasonable basis to deny her claim. If a jury could have concluded or inferred from any of the evidence

27

proffered by Belt that CIC *lacked* a reasonable basis in law or fact for denying her claim, then the directed verdict denial should be affirmed. *Id.*

Belt's case for CIC lacking a reasonable basis in law or fact for denying the claim relies on exhibits and testimony from various individuals, including employees of CIC itself. One such piece of evidence is the opinion letter regarding coverage written by Mike Risley, an attorney at Stites & Harbison. Risley was contacted by CIC to review the claim at issue and provide a legal opinion regarding coverage. In his letter, Risley opined that none of the policy exclusions applied to Belt's claim. He further advised that K-2 was an insured covered for any claims that could be brought against it. He advised that Zach Kersnick was not an insured under the policy. Finally, he advised that whether Mr. and Mrs. Kersnick were insureds under the policy turned on two questions: (1) whether the vehicle was owned by K-2 at the time of the accident; and (2) if the vehicle was owned by K-2, whether their entrustment of the vehicle to Zach constitutes conducting the business of K-2. While neither of these questions could be answered with absolute certainty, Risley wrote that it was likely that a factfinder would conclude that K-2 owned the vehicle, a fact that is noticeably absent from the Majority's opinion. Also absent from the Majority's opinion is the fact that Risley recommended taking an Examination Under Oath (EUO) and merely suggested considering filing a declaratory judgment action after the EUO was completed.

Belt used the claim file from CIC on her claim to show that after receiving Risley's opinion letter, CIC conducted no further investigation. Anything related

28

to the claim, including investigations and communications, is included in the claim file. According to the file, CIC did nothing to attempt to ascertain the answers to the questions Risley posed aside from filing a declaratory judgment action to determine coverage. Against the advice of Risley, CIC failed to take any EUOs prior to filing the coverage action.

Further, after receipt of Risley's opinion letter and throughout the pendency of the coverage action, contrary to the letter, CIC continued to tell the Kersnicks that two of the policy exclusions may apply to defeat coverage for their claim. They did this despite not only Risley's opinion, but also notes in the claim file indicating CIC's belief that the exclusions likely did not apply.

In addition to Risley's opinion letter and the claim file, the jury also saw the trial court's Findings of Facts and Conclusions of Law on coverage from the coverage action. In that order, Judge Burress found that "the entirety of the testimony presented is contrary to [CIC]'s allegation" that the Ranger was a personal vehicle and not a business vehicle. The court found that the Polaris Ranger was owned by K-2. Judge Burress further found that the party "had both a business and personal component." He also found "that Chuck and Melissa Kursnick [sic] were acting within their capacity as managers of K-2 at the time of the injury to Haley Belt." Judge Burress stated, "Providing a ride to [Belt] and the others in the vehicle at that time was *clearly* entertainment pursuant to the business purpose of the party." (Emphasis added). Finally, Judge Burress found that "at the time of the occurrence Zachary Kersnick was operating the Polaris Ranger for a business purpose within the scope of his

29

volunteer activities for K-2." Of note, Judge Burress stated that it was "undisputed" that Zach was engaged in volunteer activities on the night of the wreck. While this judgment was admitted into evidence over CIC's objection,[43] because the jury received no admonition regarding the limitations of its use, we must assume they considered the whole of the exhibit. Importantly, all of the facts upon which Judge Burress based his order were already known to CIC within mere weeks of the claim being filed.

Belt also introduced the testimony of Paul Braden at trial. Braden oversaw the entire claim file regarding coverage and settlement offers with Belt. During her examination, Belt's attorney walked Braden through each of CIC's "questions" that allegedly made a coverage determination impossible and compared them to the trial court's findings. In doing so, Belt attempted to show that in the Fall of 2011, prior to filing the declaratory judgment action, CIC had all the information the trial court used to make its decision, and should have come to similar conclusions regarding coverage. Braden testified that he had no reason not to believe Risley's opinion that K-2 Catering owned the Polaris. Braden's testimony indicated that Risley had told CIC in October of 2011 that, most likely, CIC would need to cover Belt's injuries.

---

[43] CIC challenges the entry of this evidence on appeal. At trial, CIC objected to the trial court's judgment being entered as an exhibit. Although the judge agreed to give an admonition that the opinion only be used to evaluate experts, no admonition was ultimately provided, and CIC failed to alert the court. Accordingly, the jury received the whole of the judgment. While I do not reach this issue in my dissent, I acknowledge that even in the absence of the coverage opinion, Belt still satisfies our standard for a directed verdict on a bad faith claim against an insurer.

Belt's attorney continued to underscore CIC's failure to investigate despite allegedly having lingering questions, saying, "If you look at the claim file, in the first three weeks, the Kersnicks told Cincinnati Insurance that the [Polaris] was bought for K-2 Catering, that it was at the Kentucky Fair for business, that it was bought to make it easier to transport supplies for events . . . but Cincinnati Insurance failed to . . . confirm any information it needed to confirm?" Braden responded that although CIC could have attempted to obtain the information it needed, it did not.

Belt also used Braden's testimony to establish that despite not investigating further, CIC already had all the information necessary to make a coverage determination in favor of the Kersnicks and Belt. She compared the internal opinions of CIC to the ultimate determination of coverage by the trial court in the coverage action. Alluding to the trial court's coverage opinion, Belt's attorney asked, "So the same thing that you knew in 2011, the judge found two and a half years later. Is that correct?" Braden responded, "That is correct."

CIC claimed that ownership of the Polaris was an issue for resolution at the coverage trial. However, Braden was not surprised by the trial court's determination that the Polaris was owned by K-2 Catering, as he had reached this same conclusion shortly after the claim was filed. Braden testified, "[T]he court agreed, as I did, that [the Polaris] did belong to K-2 Catering." Yet, when Braden was pushed on the matter, he continued to allege that CIC "didn't know with certainty either way."

31

Braden also testified that despite lingering questions, CIC failed to conduct any investigation into the financing of the Polaris, failed to speak with anyone at the party other than the Kersnicks themselves, failed to follow up on the Kersnicks' assertion that they used other company equipment at the party, and failed to seek out any additional information that would be relevant to coverage. CIC failing to act was a theme throughout Belt's case and was central to her claim of bad faith.

Finally, Braden testified that CIC knew that K-2's equipment was being used at the party and that several employees worked at the event. CIC failed to follow up with any of these employees, however, about the nature of the event. Belt's injury would not be covered if the event was unrelated to K-2 Catering's business. In spite of the importance of this question, CIC failed to follow up on an email from Mrs. Kersnick sent the day after her recorded interview with CIC. The majority chose to completely disregard this evidence. The email clarified several facts relevant to coverage. These facts were favorable to coverage. Although no one testified that they did not believe Mrs. Kersnick, CIC maintained that coverage was unclear. Instead of investigating, CIC filed the coverage action.

In addition to the above, the trial court also heard several other individuals testify to facts supporting a conclusion that CIC lacked a reasonable basis in law or fact for denying the claim. These testimonies further buttressed the evidence noted above. Together, they draw a picture of an insurer that had all the information that the trial court had, that failed to

32

investigate further in spite of a duty (and an apparent internal need) to do so, and that despite internal opinions to the contrary, led insureds to believe they may not be covered due to irrelevant exclusions.

Jessica Hawkins, the on-the-ground adjuster for the claims file, testified that on the first day she received the file, CIC already had information that the Polaris was purchased for business use and that Zach was at fault. Wes Grushon, the CIC employee in charge of Zach's defense file, and Elizabeth Schirm, the CIC employee who oversaw Mr. and Mrs. Kersnick's and K-2's defense file, similarly testified that CIC was aware that Zach would likely be found liable. The trial court heard further testimony from Schirm, Hawkins, and Grushon that even without medical records, they knew Belt's injuries were severe. Hawkins specifically stated that within two weeks of the accident (after learning of the degloving), she knew that Belt's injuries would total in the six figures. This fact was bolstered by testimony from John Martin, the attorney hired by CIC to defend Mr. and Mrs. Kersnick and K-2. Martin stated that he knew there could be an excess verdict[44] based on Belt's injuries and notified CIC of that numerous times.

Despite the testimony regarding the extent of Belt's injuries, no one from CIC could explain why only one offer of merely $250,000 was made. Even CIC's own expert, Bill Woolums, testified that CIC should have had a reasonable explanation for any offer that it made, and that there was no explanation at all

---

[44] An excess verdict is one which exceeds the liability limits of the insurance company.

for the $250,000 offer. Schirm testified that she requested authority to make a higher offer, but this request was denied by upper management.

Britta Moss, Belt's expert, similarly testified that there must be a reasonable basis or explanation for any settlement offer made regarding a claim. Since there was no evaluation of the value of the claim and no explanation of how they arrived at the $250,000 offer, CIC failed to comply with industry standards, according to Moss. Moss outlined several other ways in which CIC failed to comport with industry standards, including unjustly delaying payment, focusing on a theory of coverage and seeking only to support that theory (called "prejudgment"), failing to clearly and truthfully communicate, failing to objectively evaluate the claim, failing to use proper standards to deny the claim, failing to complete a reasonable investigation, misrepresenting facts and policy provisions, failing to attempt to settle when liability under the policy was reasonably clear, and failing to provide a basis for coverage decisions. Moss also testified that the filing of a coverage action does not suspend these duties; they persist through the life of the claim. So, according to Moss, the coverage action did not save CIC from potential bad faith.

Moss's, Hawkins's, and Braden's testimonies indicated that by September 8, 2011, CIC had all the factual information it would ever have regarding coverage. With only that information, Risley was able to draw the conclusions for his letter, and in the coverage action, a judge was able to draw a conclusion in favor of coverage (echoing Braden's testimony described above).

34

Nevertheless, CIC failed to investigate Risley's outstanding questions or negotiate above its initial, baseless offer. Moss testified that an insurer has a duty to conduct a full investigation before denying a claim. She further stated that a reasonable investigation requires making an effort to gather all the facts that are relevant to a coverage determination, continuing to ask questions, following up with individuals named as relevant parties to a determination, and seeking additional information where facts seem contradictory or confusing. Moss stated that in the insurance field, it is common—and necessary—to further investigate claims in order to make a determination. She stated that CIC did not act appropriately after receiving the follow-up email from Mrs. Kersnick because the email provided multiple additional avenues CIC could have explored, but it failed to do so.

Because, according to Moss, the issue of whether there was coverage for K-2 and the Kersnicks was not fairly debatable, and since CIC should have known that, CIC should have attempted to settle for the policy limits. Instead, Moss testified, CIC had made a prejudgment about the claim and was therefore looking for ways to refuse to pay the claim, initiating a coverage action in an attempt to save money or extort a lower settlement. In doing so, Moss stated that CIC effectively denied Belt's claim without a full investigation. A jury could easily infer from the above testimony, taken together, that CIC lacked a reasonable basis in law or fact for denying the claim.

Moss was particularly concerned with CIC's continued insistence that exclusions may apply to defeat coverage. CIC sent letters to the Kersnicks for

35

years citing exclusions even when it both believed and was told none would apply. This testimony was supported by the testimony of Braden as well as Risley's opinion letter. CIC's expert, Woolums, specifically testified that he believed including the mobile exclusion in the Reservation of Rights letter was a mistake. He even stated that he "won't disagree" with calling it a misrepresentation. Terry Feeney, CIC's headquarters field claims supervisor, acknowledged that an adjuster should not say that an exclusion may defeat coverage when they know it doesn't apply. Feeney further testified, in accordance with Moss's testimony, that doing otherwise could give rise to a bad faith claim. This fact is bolstered by CIC's internal Bad Faith Training PowerPoint, entered as an exhibit, which states that giving misleading information such as this can be the basis of a bad faith claim and should be avoided. Each of the CIC employees who worked Belt's claim had taken this training multiple times. Moss testified that it was outrageous to repeatedly cite exclusions that do not apply.

In summary, the jury heard the following evidence. CIC did not rely on advice of counsel in this case. Braden decided not to conduct the EUO and to file a declaratory judgment action instead. CIC stopped investigating completely after less than a month despite lingering questions and misinformed relevant parties regarding policy exclusions. CIC deliberately told the Kersnicks the opposite of what its own counsel stated in an effort to delay or effectively deny coverage, despite factual and legal bases supporting coverage. No attorney testified that Risley's opinion letter was inaccurate or that his opinions were

questionable. No one testified as to why a low offer was made. There was no apparent justification for the offer at all. No one investigated any alleged controversies relating to coverage. Experts for both sides implied that CIC acted unreasonably. Belt's expert testified that CIC subverted many industry norms and duties. Belt entered exhibits from CIC showing that its employees should have known that what they were doing was in bad faith, by their own training materials. Finally, the jury saw Risley's opinion letter and the judgment in the coverage action, both of which landed approximately in the same place: CIC needed to cover Belt's injuries. The judgment itself made CIC's arguments against coverage seem lacking in evidentiary grounding.

With all this evidence and reasonable inferences drawn from it, a juror certainly could have been convinced of CIC's lack of a basis in fact or law for denying coverage. According to testimony, either CIC knew everything it needed to determine coverage and did not settle the claim anyway, or it had lingering questions related to coverage that it could have resolved, but did nothing to investigate. In either case, CIC had a legal duty and flouted it. As in *Demetre,* the evidence taken in a light most favorable to Belt shows "a sustained effort . . . to deny coverage long after it could and should have determined that it was legally obligated." *Demetre*, 527 S.W.3d at 30. It further shows, as did the evidence in *Demetre*, that "[the insurer] was far more interested in denying coverage than defending . . . against [the] claims." *Id.* Accordingly, I would have affirmed the trial court on this element of bad faith.

*B. Element Three*

37

To reiterate, the third *Wittmer* factor requires that an insurer "either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Wittmer*, 864 S.W.2d at 890. Proof of the third element "requires evidence that the insurer's conduct was outrageous, or because of . . . reckless indifference to the rights of others." *Hollaway*, 497 S.W.3d at 738 (citation omitted). In looking for reckless indifference or outrageousness, we "no longer consider" an "evil motive" on the part of the insurer. *Id.* at 738 n. 11.

Taken together, I believe the weight of the evidence outlined above is sufficient to show outrageous conduct and a reckless indifference to Belt's and the Kersnicks' rights under the CIC policy. Such an institutional failure to investigate, inform, or reasonably settle with parties to this claim—given the magnitude of the injury and the number of CIC representatives who failed to comport with industry standards over the course of several years—should be sufficient in and of itself to provide sufficient evidence of outrageous or reckless conduct to survive our directed verdict standard.

However, Belt introduced several explicit pieces of testimony indicating outrageousness and reckless indifference to the rights of others. Following the court's coverage opinion, Braden stated that he was "indifferent" about the decision—a jury could infer from this that CIC did not initially want to abide by the ruling specifically delineating the rights of policyholders in this case.

Moss's testimony is even more compelling. Moss stated that it was outrageous for CIC to repeatedly cite exclusions that did not apply and

38

indifferent for CIC to limit the reserve on Belt's claim given the severity of her injuries and the near inevitability of coverage.

Some may reasonably argue that events underlying this claim were not as severe as those in *Demetre*. However, *Demetre* is not the floor for bad faith claims. Neither does the evidence described in this dissent amount to mere technical violations of the Kentucky Unfair Claims Settlement Practices Act, as alleged by the Majority. In fact, the evidence viewed in the light most favorable to Belt could lead a reasonable juror to believe that CIC blatantly misrepresented policy provisions to the Kersnicks, as was deemed sufficient to satisfy *Wittmer*'s third factor in *Farmland Mutual Insurance Co. v. Johnson*, 36 S.W.3d 368, 377 (Ky. 2000). A reasonable juror also could find that CIC focused its investigation on evading paying Belt's claims, as occurred in *Hamilton Mutual Insurance Co. of Cincinnati v. Buttery*, 220 S.W.3d 287, 293 (Ky. App. 2007). Finally, a reasonable juror could find that the purpose of CIC's delay "was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage," as the Court in *Motorists Mutual Insurance Co. v. Glass* said was required for bad faith. 996 S.W.2d 437, 453 (Ky. 1997), *abrogated on other grounds by Hollaway*, 497 S.W.3d 733. Given Moss's testimony, Braden's statements, and the gravity of CIC's alleged failures presented to the jury, I would hold that Belt satisfied the third prong of the *Wittmer* analysis for the purposes of surviving a motion for directed verdict.

39

## II.     CONCLUSION

In this case, we are not called to make credibility determinations for witnesses. We are not called to determine what we, as a Court, would have found given the totality of the evidence. Instead, we are called to determine if Belt had enough evidence to survive a motion for directed verdict. To do so, Belt needed only to put on enough evidence for each of the *Wittmer* factors to be potentially found by a jury without "passion or prejudice," so as to be "palpably or flagrantly against the evidence." *Lewis*, 798 S.W.2d at 461–62. "A directed verdict is proper only when there is a complete absence of pleading or proof on a material issue in the action, or there is no disputed issue of fact upon which reasonable men could differ." *Harper v. Univ. of Louisville*, 559 S.W.3d 796, 801 (Ky. 2018) (internal quotations and citations omitted). This Court is constrained in its analysis to its standard of review.

In the case at bar, a jury, having been convinced after seven days of trial, awarded Haley Belt $1,083,472.39 in compensatory damages and $3,500,000 in punitive damages. The Majority today would take away that jury's award. Because I believe that Belt presented sufficient evidence to overcome a motion for directed verdict, I respectfully dissent from the Majority's opinion.

Conley and Nickell, JJ., join.

40

COUNSEL FOR APPELLANT/CROSS-APPELLEE:

Jennifer A. Moore
Emily A. DeVuono
Moore Law Group, PLLC

Don Battcher
Batcher Law Office, PSC

COUNSEL FOR APPELLEE/CROSS-APPELLANT:

Pamela A. Chestnut
Robert A. Jenkins
Kinkead and Stilz, PLLC

COUNSEL FOR AMICUS CURIAE, INSURANCE INSTITUTE OF KENTUCKY:

Susan L. Maines

COUNSEL FOR AMICUS CURIAE, KENTUCKY DEFENSE COUNSEL, INC.:

Patricia Colleen Le Meur
William Baxter Oberson, Jr.

COUNSEL FOR AMICUS CURIAE, UNITED POLICYHOLDERS:

Philip Gray Fairbanks
Bartley Kemble Hagerman
Mendel Austin Mehr